FLORIDA MARBLE POLISHERS HEALTH AND WELFARE TRUST FUND, Florida Marble Polishers Pension Trust Fund, Florida Marble Polishers Holiday and Unemployment Trust Fund, and Florida Marble Polishers District Council, Plaintiffs-Appellants,

v.

EDWIN M. GREEN, INC., a Florida Corporation, and Green's Pool Service, Inc., a Florida Corporation, Defendants-Appellees.

No. 80–5264.

United States Court of Appeals, Fifth Circuit. Unit B

Aug. 17, 1981.

Howard S. Susskind, Steven Bloom, Robert A. Sugarman, Miami, Fla., for plaintiffs-appellants.

Alan A. Bruckner, Coconut Grove, Fla., for defendants-appellees.

Before MILLER *, Judge, and FRANK M. JOHNSON, Jr., and THOMAS A. CLARK, Circuit Judges.

MILLER, Judge:

This appeal is from the judgment of the district court denying the motion by plaintiffs-appellants ("unions") for partial summary judgment and granting defendants-appellees' motion for summary judgment in an action brought under section 301(a) of the Labor Management Relations Act, 1947, 29 U.S.C. § 185(a).[1]  We affirm.

*Findings of District Court* [2]

Edwin M. Green, Inc. ("EMG") has been engaged in the swimming pool construction business since 1950. Edwin M. Green and his mother own 50% of the stock each, and since 1958 he has been its president. It has operated as a union shop. In 1965, Green's Pool Service, Inc. ("GPS") was organized by Edwin M. Green and engaged in swimming pool service and maintenance. As 98% owner, he became its president. It has operated primarily with nonunion labor. Both corporations operate in the South Florida area.

In 1971, due to the emergence of competing nonunion swimming pool construction companies, GPS entered the swimming pool construction business—this in addition to its service and maintenance activity. (In their brief, the unions assert that the objective of EMG and GPS was "to secure the largest possible portion of the construction market in the swimming pool business . . .," citing a page in the record below; however, as appellees point out, the cited record page discloses no evidence to support the assertion.) Some two years later, on August 15, 1973, Edwin M. Green, as President of EMG, executed a written collective bargaining agreement with the Florida Marble Polishers District Council as collective bargaining agent for and on behalf of its affiliated local unions). This agreement is the basis for the unions' claim against defendants-appellees, although the unions never sought to

---

* Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

1. 29 U.S.C. § 185(a) provides as follows:

    Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

2. While the district court properly took into account all of the facts and circumstances of the case, only those of substantial relevance to our decision are included herein.

organize GPS either before or after execution of the agreement.[3]

From 1956 until October of 1977, EMG was managed by Jack Eddington, its general superintendent. Following Eddington's retirement, Edwin M. Green assumed all managerial and executive duties until November of 1979, when a new superintendent, Kenneth Bishop, was appointed. From 1965 until March of 1974, GPS was managed by Charles Bromley, who left to accept a position with another firm. He returned in August of 1977 and resumed management until May of 1978, when he resigned for good. During Bromley's first absence and from May of 1978 until March of 1979, when G. P. Shivak was appointed general manager, Edwin M. Green took over the management. Thus, from May of 1978 until March of 1979, Edwin M. Green ran both corporations. However, when Eddington was with EMG, he was in "full charge" of all construction, labor relations, and day-to-day production activities, while Edwin M. Green functioned as financial head and was primarily occupied with sales, marketing, and administration; and, when Bromley was with GPS, he "possessed and exercised complete control over the operations . . . conferred with the sales force concerning marketing and sales, managed labor relations, including the setting of wage rates, hiring and firing, and all other conditions of employment," while Edwin M. Green was concerned with consultation on financial matters. There is no evidence suggesting that the two resignations of Bromley were motivated by anything other than his own personal reasons. Also, "there is no evidence suggesting that the business and policy decisions of the two corporate defendants were coordinated, or dependent upon each other in any way."

The posture of GPS, from its inception as a pool service and maintenance firm through its entry into the swimming pool construction business, "was based solely on business factors and was totally void of any underlying manifestations of union animus."

There has been some degree of overlapping of the operations of EMG and GPS. Thus, some employees of GPS have been employed by EMG at different times, but never jointly. Certain salespersons have been employed jointly. EMG purchases and warehouses some of the materials and supplies used by both corporations, but GPS pays EMG for the goods it uses. The parking area used by GPS is owned by EMG, but GPS pays rent for its parking privileges. On occasion they have leased equipment to each other. They share a common telephone number at one location for which expenses are shared. The record does not support a suggestion that payments of one corporation for goods and services chargeable to the other were at less than the fair market price.

To a much larger extent, the operations of EMG and GPS are separate. Each has its own physical location, materials, supplies, motor vehicles, and stationery. There is no commingling of funds, and each operates on its own capital without guaranteeing the performance of the other. Each maintains its own bank accounts, lines of credit, payroll accounts, billings, services, and insurance. They do not compete for the same jobs, nor have they ever worked on the same job site except in those limited situations where GPS subcontracted work to EMG. Union employees of EMG have not lost work, which they otherwise would have performed, to employees of GPS.

## OPINION

The unions have premised their argument on two points: (1) that, in the circumstances of this case, the defendant corporations are a single employer under section 2(2) of the NLRA, 29 U.S.C. § 152(2), and both are bound by the terms of the collective bargaining agreement; *or* (2) regardless of the single employer issue, the defendant corpo-

---

**3.** The unions state that they were unaware, until 1978, that GPS was constructing swimming pools, but there is evidence that as early as June of 1974 the auditor for the Marble Polishers Union thought that GPS might be covered by a union contract with EMG; also, certain salesmen worked jointly for EMG and GPS.

rations are bound by the terms of the collective bargaining agreement[4] and have breached the agreement by failing to make the fringe benefit contributions and other payments to the plaintiffs-appellants in accordance with the agreement.[5] The unions make clear that the purpose of Article XI, Section 4, is to require the "Employer" to pay the fringe benefit contributions for hours worked by the nonunion business (here, GPS). The district court concluded, as a matter of law, that EMG and GPS are each separate, autonomous employer entities and are not a single employer, analyzing the facts from the standpoint of the factors of common ownership, interrelation of operations, common management, and centralized control of labor relations. *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of*

*Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). The court did not comment on the unions' second point, although this was stressed in the unions' motion for reconsideration, which was summarily denied. The unions say that "the failure of the lower court to address this issue is a major reason for this appeal."

The district court's conclusion on the single employer issue was based on findings of fact warranted by the record, including a stipulation of the parties, a deposition of Edwin M. Green, an affidavit of Edwin M. Green, and an extract from a deposition of Dennis Murphy, business manager of Marble Polishers Local Union 12. These findings fully support the district court's conclusion.[6]

Comparison of the facts in this case with those in *Local 627, International Union of*

---

4. Article XI, Interpretation of This Agreement, Section 4, provides:

For the purpose of determining the responsibility and liability of the Employer under the terms of this Agreement, the word "Employer" as used throughout this Agreement is hereby defined to mean the firm described below, whether a sole proprietorship, joint venture, or corporation; in addition, the word "Employer" shall at all times be defined to include any and all other business entities doing business in whole or in part in the trade and territorial jurisdiction of the District Council, including but not limited to a sole proprietorship, a partnership, a corporation, a joint venture, an assign, a successor, a subsidiary, a parent corporation, a merger, a lessee or a lessor, which are owned, controlled or operated by one or more of the members, stockholders or officers, of the firm described below; or, in which one or more members, stockholders, or officers of such entity *owns*, controls or operates the firm described below. For the purpose of this definition, a person will be deemed to "control or operate" a business entity if he is its managing or principal officer or member, *or if he is in charge of its labor relations in whole or in part.*

5. Article III, Wages and Premiums, Section 7 provides in pertinent part as follows:

(A) HEALTH AND WELFARE
Commencing April 1, 1972, and weekly thereafter, the Employer agrees to contribute the sum of thirty cents (30¢) per hour to the FLORIDA MARBLE POLISHERS HEALTH AND WELFARE TRUST FUND, an existing common law Joint Trust Fund. On April 1, 1973, and continuing until a new Agreement

is reached between the parties, the Health and Welfare contributions shall be forty cents (40¢) per hour.
. . . .

(C) PENSION
Commencing April 1, 1972, and weekly thereafter, the Employer agrees to contribute the sum of twenty-five cents (25¢) per hour to the FLORIDA MARBLE POLISHERS PENSION TRUST FUND, an existing common law Joint Trust Fund. On April 1, 1974, and continuing until a new Agreement is reached between the parties, the Pension contribution shall be thirty cents (30¢) per hour.

(D) Contributions required to be paid . . . above, are required to be paid for the duration of this Agreement and shall be paid on each hour worked by every employee working within the trade and territorial jurisdiction set forth in this Agreement. Contributions shall be made weekly to the Florida Marble Polishers Escrow Account, in one check, accompanied with forms setting out information the Trustees deem necessary in the administration of the Joint Trusts.

6. Even if it were established that EMG and GPS constituted a single employer, it would not necessarily follow that the employer-wide unit, which the contract would establish, is appropriate. *Local 627, Int'l Union of Operating Engineers v. NLRB,* 595 F.2d 844, 849 (D.C.Cir. 1979). *See South Prairie Construction Co. v. Local 627, Int'l Union of Operating Engineers,* 425 F.2d 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 152–53, 61 S.Ct. 908, 912, 85 L.Ed. 1251 (1941).

*Operating Engineers v. NLRB*, 518 F.2d 1040 (D.C.Cir.1975), *rev'd in part on unrelated issue sub nom. South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976), on which the unions heavily rely, clearly shows the relative weakness of the unions' position here on the single employer issue. Perhaps the most decisive difference is that the involved "double breasted" operation [7] in *Operating Engineers* was established on or about February 25, 1972, when the involved collective bargaining agreement had been in effect since July of 1970 and was the third in a series of agreements commencing in 1960; whereas in this case, GPS entered the pool construction business some two years *before* the involved agreement between EMG and the unions.[8]

Under Article XI, Section 4 of the Agreement, it is clear that GPS is an "Employer," since Edwin M. Green is a stockholder (50%) of EMG, signatory to the Agreement, and owns 98% of the stock of GPS, and, further, since GPS is doing business in the trade and territorial jurisdiction of the District Council. As such, GPS has the "responsibility and liability" for recognition of the District Council [9] as provided in Article II, Section 1:

> The Employer recognizes the Council on behalf of its affiliated Local Unions as the collective bargaining agent of all employees engaged in the work covered by this Agreement within the above territorial jurisdiction.

Thus, the parties to the agreement have undertaken, in effect, to usurp not only the GPS employees' right of self-determination under section 7 of the NLRA, 29 U.S.C. § 157, but also the authority of the NLRB under section 9(b), 29 U.S.C. § 159(b), to determine the appropriate bargaining unit for those employees. This they may not do. *Sheraton-Kauai Corp. v. NLRB*, 429 F.2d 1352, 1357 (9th Cir. 1970); *NLRB v. Sunset House*, 415 F.2d 545 (9th Cir. 1969) (petition for enforcement granted for NLRB order denying applicability of collective bargaining agreement to accretion of employees of new store far removed from existing unit); *Welch Scientific Co. v. NLRB*, 340 F.2d 199 (2d Cir. 1965) (unfair labor practice for employer to apply agreement covering Chicago plants to employees in new New York plant); *see NLRB v. Retail Clerks Local 588*, 587 F.2d 984, 986 (9th Cir. 1978) (since contract rights cannot exist independent of union's right to represent the unit, new stores clause cannot bind new employees despite employer's acquiescence); *NLRB v. Vernitron Electrical Components, Inc., Beau Products Division*, 548 F.2d 24 (1st Cir. 1977) (unfair labor practice for employer to assist union in organizing its employees,

---

7. In general, double breasted units are formed in order to allow a contractor to compete for union and nonunion work. For example, a subcontractor may wish to operate one corporation that employs union workers and which, therefore, can bid for work from general contractors who let contracts only to unionized subcontractors. Simultaneously, the subcontractor may operate a nonunionized corporation which will bid on jobs let by general contractors who do not require unionized subcontractors. *Local 627, Int'l Union of Operating Engineers v. NLRB*, 595 F.2d at 845 n.1.

8. The unions state that appellees "admit in their brief, GPS was set up as non-union in order to avoid the terms and costs of the collective bargaining agreement that EMG operated under . . . ." We find no such admission by appellees; indeed, such an admission would be anomalous considering that GPS was established as nonunion long before the involved collective bargaining agreement. The unions have also used this statement to bootstrap their argument of "union animus" on the part of EMG, which is contrary to the finding of "lack of union animus" by the district court.

9. For purposes of this proceeding, we assume, without deciding, that the plaintiff trust funds have standing to maintain this action, along with the District Council. However, we note that the record contains letters from the Regional Director of the National Labor Relations Board ("NLRB") to appellees' counsel relating to a charge of unfair labor practice filed by GPS and EMG against the trust funds. The Regional Director states that, after an investigation, he refuses to issue a complaint because the trust funds are not labor organizations within the meaning of section 2(5) of the NLRA.

and good faith no defense). *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 788–89 (5th Cir. 1973) (unit always subject to NLRB's approval and is not finalized simply because arbitrator decided employer agreed to accretion in the contract); *Local 7–210, Oil, Chemical & Atomic Workers v. Union Tank Car Co.*, 475 F.2d 194, 199 (7th Cir. 1973) (contractual rights of union cannot exist separately and apart from union's right to represent the unit); *contra NLRB v. Appleton Electric Co.*, 296 F.2d 202 (7th Cir. 1961).

Enforcement of the agreement against GPS through a proceeding under section 301(a) of the Labor Management Relations Act, 1947, 29 U.S.C. § 185(a), would not render the Agreement any less contrary to the Congressional policies underlying sections 7 and 9(b) of the NLRA. Enforcement of the agreement against EMG would improperly require it to make contributions with respect to GPS employees as though it were a single employer, which it is not. The unions cite several cases upholding union standards clauses in the case of work subcontracted by the employer.[10] However, there is no issue in this case over subcontracting by EMG to GPS; and the subcontracting situation is, at most, analogous to the single employer or alter-ego situation, which is not present here.

In view of the foregoing, the judgment of the district court is AFFIRMED.

---

**10.** *Walsh v. Schlecht*, 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977); *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105 (9th Cir. 1979); *Construction Materials Trucking, Inc.*, 198 N.L.R.B. 1038, 81 LRRM 1109 (1972).