## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## LEONARD B. HEBERT, JR. & CO., INC. and Landis Construction Co., Inc., et al., Respondents.

### No. 82-4085.

United States Court of Appeals, Fifth Circuit.

Jan. 31, 1983.

Rehearing and Rehearing En Banc Denied April 1, 1983.

Elliott Moore, Deputy Assoc. Gen. Counsel, Peter Winkler, N.L.R.B., Washington, D.C., for petitioner.

William E. Hester, III, Charles H. Hollis, New Orleans, La., for respondents.

Before GARZA, REAVLEY and GARWOOD, Circuit Judges.

REAVLEY, Circuit Judge:

This appeal represents the latest round in litigation involving Carpenters District Council of New Orleans and Vicinity Local Union No. 1846 (the "Union") and various employers of union and nonunion construction workers in the New Orleans area. On March 14, 1980, the Union filed formal charges with the National Labor Relations Board ("NLRB" or the "Board") against ten employers (the "employers" or "companies") alleging that the employers had engaged in unfair labor practices within the meaning of §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5) (the "Act"). The basis of the complaint was that the employers had refused, in derogation of collective bargaining agreements existing among the parties, to disclose information that would assist the Union in determining whether the employers were utilizing "double breasted"[1] operations to evade their contractual obligations toward the Union. The NLRB, upholding a decision of an administrative law judge ("ALJ"), found that the named employers had violated §§ 8(a)(1) and (5) of the Act by refusing to furnish the requested information and ordered its disclosure. The Board petitions this court for enforcement of its order and we enforce it in all respects.

I.

Each of the ten companies involved in this litigation is a member of the Associated General Contractors of Louisiana, Inc., New Orleans District ("AGC-New Orleans" or "AGC"), a trade organization consisting of construction contractors. Although the companies' position as to whether AGC-New Orleans constitutes a multi-employer bargaining unit (a question we need not decide) is unclear from the record,[2] it appears that AGC has engaged in joint bargaining with the Union on behalf of the companies, which has resulted in the execution of collective bargaining agreements between the Union and the employers. AGC is not a signatory to these agreements, but the individual employers are. Such agreements have been in effect since at least 1961, thus covering the timespan of the factual events involved in this case. Collec-

---

1. We recently explained how a "double breasted" or "open shop/closed shop" operation works in *Florida Marble Polishers Health & Welfare Trust Fund v. Edwin M. Green, Inc.,* 653 F.2d 972, 976 n. 7 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2235, 72 L.Ed.2d 846 (1982). Such an operation is one allowing an employer to compete for both union and nonunion work. For instance, a subcontractor will operate two corporations, one hiring strictly union employees; the other, nonunion employees. The former will bid on jobs from general contractors who utilize only unionized subcontractors; the latter bids only on work from general contractors who use nonunion workers. *Id.* A double breasted operation may or may not violate a labor contract.

2. At oral argument, counsel for the companies vigorously denied that AGC-New Orleans constitutes a multi-employer bargaining unit collectively representing all of the employers. The record reflects that counsel earlier filed written exceptions to the ALJ's decision specifically objecting "[t]o the finding that the [companies] deny the existence of a multi-employer bargaining unit." In any event, AGC's status as an official multi-employer bargaining unit is irrelevant to our present decision because, as explained more thoroughly in text, it is clear that AGC conducted the actual collective bargaining on behalf of the employers with the Union, even though AGC did not itself become a signatory party to the final agreements. Moreover, AGC is not a defendant in this action and has not itself been ordered to disclose any information.

tive bargaining agreements in effect from May 1, 1977 through April 30, 1982 contained a "recognition clause" acknowledging the Union as the exclusive representative of each signatory employer's carpenters. The contracts did not contain a "subsidiary clause", however, whereby the agreements would have applied to any double breasted counterparts operated by the employers. The Union had negotiated for such a provision in 1971 and again in 1974 but was unsuccessful in getting the companies to agree to it. The Union did not negotiate for a subsidiary clause thereafter because it lacked sufficient information confirming—and the companies denied maintaining—any double breasted operations.

Despite the fact that the companies involved here denied double breasting, the Union was presented with evidence from time to time that tended to indicate otherwise. For example, the record reveals that in 1979 the Board held a representation election at Claiborne Builders, a New Orleans construction employer not involved in the instant case. Two Union officials, Davy Laborde, Sr., and James Paulino, Jr., were present to insure that the election was conducted fairly. Laborde noticed that the election site was also the premises of Perrilliet-Rickey Construction Company ("Perrilliet"), an employer who was then a member of AGC-New Orleans and a party to the collective bargaining agreement with the Union. When Laborde commented on this, the treasurer of Perrilliet, Joe Lemoine, told Laborde and Paulino that Perrilliet had formed Claiborne as a nonunion, double breasted subsidiary for the purpose of competing against the double breasted operations of other AGC members who had agreements with the Union. Lemoine then apparently specified several AGC member/employers that utilized double breasted operations.

The record also reveals that on another occasion, a Union agent observed construction equipment bearing the name of Leonard B. Hebert, Jr. & Co., one of the employers involved in this case, at the jobsite of a nonunion contractor, Professional Construction Services. Later, a Hebert superintendent intimated to Laborde the existence of an affiliation between Hebert and Professional.

Finally, record evidence reveals that another New Orleans construction employer, Boh Bros. Company (a respondent in this case) created a nonunion counterpart, Broadmoor Corporation. Boh Bros. was a party to collective bargaining agreements with the Union and was a member of AGC. Employees of Boh Bros. informed Laborde when they relinquished their union membership that they were going to work for Broadmoor Corporation. Thereafter, Laborde actually observed former union members working at a Broadmoor Construction site.

Based on this type of information, the Union sent to each of the ten respondent companies a letter requesting information concerning possible double breasting. These letters were mailed between January 18 and February 12, 1980.[3] None of the companies provided the requested information. Interestingly, five of the ten companies responded (each separately) with letters that read identically, word-for-word, asking the Union to disclose "detailed" reasons justifying its request for information.

In the meantime, collective bargaining negotiations between the Union and AGC, on behalf of the employers, commenced regarding renewal of the agreement that was to expire on April 30, 1980. Laborde testified before the ALJ that Robert Boh, President of both AGC and Boh Bros. Company, commented disparagingly during the course

---

**3.** Each letter requested answers to 13 questions designed to determine the extent, if any, of the affiliation between the employer/addressee and its alleged double breasted counterpart which was specifically named in the letter. For example, the questions inquired as to the existence of common management or ownership between the companies and whether they shared customers or equipment. We believe that the letters set forth sufficient background information about the focus and nature of the Union's inquiry to put the employer/addressee on notice of the basis of the Union's suspicion concerning double breasting.

of these negotiations on the Union's letter and subsequent filing of unfair labor practice charges with the Board. Boh denied this during testimony before the ALJ, but the ALJ made a credibility determination that Laborde's version of the events was more believable.

## II.

■ Well-established labor law precedent imposes upon employers a duty "to provide information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967). An employer's refusal to furnish information relevant to a union's negotiation or administration of a collective bargaining agreement may constitute a breach of the employer's duty to bargain in good faith in violation of § 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5). *NLRB v. Acme Industrial Co., supra,* 385 U.S. at 435–36, 87 S.Ct. at 567–68; *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979).

■ The situation here is virtually indistinguishable from one faced recently by the Ninth Circuit. *NLRB v. Associated General Contractors of California, Inc.,* 633 F.2d 766 (9th Cir.1980), *cert. denied,* 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981). As *Associated General Contractors* explains, the key inquiry is whether the information sought by the Union is relevant to its duties. 633 F.2d at 770. The Supreme Court has adopted a liberal, discovery-type standard by which relevancy of requested information is to be judged. *Id.; Acme Industrial Co.,* 385 U.S. at 438 & n. 6, 87 S.Ct. at 568–69 & n. 6. Information intrinsic to the employer-union relationship, such as that pertaining to wages and other financial benefits, is considered presumptively relevant, with the employer having the burden of showing irrelevance. *Associ-*

*ated General Contractors,* 633 F.2d at 770 n. 4a. Where, however, a union seeks information not ordinarily pertinent to its performance as bargaining representative, but alleged to have become relevant due to particular circumstances, no presumption exists and the union has the initial burden of establishing relevancy before the employer must comply. *San Diego Newspaper Guild v. NLRB,* 548 F.2d 863, 867 (9th Cir. 1977). Information of the type sought by the Union in this case does not appear to be presumptively relevant, *see Associated General Contractors,* 633 F.2d at 770, and thus the Union here has the initial burden of showing relevancy.

■ We hold that the Union has met that burden. As recounted earlier, the Union had numerous indications (*before* it made its request) that several member/employers of AGC-New Orleans had created double breasted operations to evade contractual obligations toward the Union. Some of these indications were indirect, such as the statement to Laborde from a third party (Lemoine) that many employers were utilizing double breasted operations. Other indications were direct, such as Laborde's observation of formerly union employees working at a Broadmoor Corporation construction site after these employees had told Laborde they were relinquishing their union membership in order to go to work for the double breasted counterpart of Boh Bros. This evidence, acquired by the Union before it requested the information, and testified to at the hearing before the ALJ, formed a reasonable basis for further investigation of the suspected double breasting. This is to say that the type of information sought by the Union would assist it in confirming its suspicions and thereby allow it to make an informed choice[4] whether to pursue legal means by which it could hold the nonunion companies to the terms of the collective bargaining agreements involved here. For as we

4. *See Acme Industrial Co.,* 385 U.S. at 438 n. 8, 87 S.Ct. at 569 n. 8, *quoting Fafnir Bearing Co. v. NLRB,* 362 F.2d 716, 721 (2d Cir.1966) ("By preventing the Union from conducting these studies [for an intelligent appraisal of its right to grieve], the Company was, in essence, requiring it to play a game of blind man's bluff") (bracketed changes appearing in Supreme Court opinion).

recently had occasion to explain in depth, in an appeal involving some of the same parties now before us, two separate methods exist by which a nonunion employer may be held to the terms of a collective bargaining agreement executed by its alleged union counterpart: the single employer doctrine and the alter ego doctrine. *Carpenters Local Union 1846 v. Pratt-Farnsworth, Inc.,* 690 F2d 489, 504–09 (5th Cir.1982). Our opinion in *Pratt-Farnsworth* answers the contention by the employers that the sought-after information is irrelevant to the administration and enforcement of existing collective bargaining agreements, to the Union's duty of fair representation for its members, or to its ability to bargain effectively with the companies concerning future contracts.

The employers also argue that the information is irrelevant because the Union already knew that two construction employers in the New Orleans area, Perrilliet-Rickey and Pratt-Farnsworth, utilized double breasted operations.[5] Moreover, the employers contend that if the Union wanted to find out if any of the other companies were involved in double breasting, it could have filed a unit clarification petition with the NLRB. We reject these arguments for several reasons.

■ First, they misread the standard by which the relevancy of the information is to be judged. As noted earlier, a disclosure request is examined under a liberal, dis-covery-type standard. The Union need only be "acting upon the probability that the desired information [is] relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities. This discovery-type standard decide[s] nothing about the merits of the union's contractual claims." *Acme Industrial Co.,* 385 U.S. at 437, 87 S.Ct. at 568 (footnote omitted). "It is sufficient that the information sought is relevant to possible violations where the union has established a reasonable basis to suspect such violations have occurred. Actual violations need not be established in order to show relevancy." *Associated General Contractors,* 633 F.2d at 771.

Second, whatever information the Union possessed with regard to Perrilliet-Rickey and Pratt-Farnsworth could not answer the Union's suspicions about the other companies involved here. Perrilliet-Rickey is not even a respondent in this case.[6]

■ Third, the Union need not take the formal action of filing a unit clarification petition with the Board before it can discover the information. Again, the liberal, discovery-type standard refutes such an argument. *See Acme Industrial Co.,* 385 U.S. at 437–38, 87 S.Ct. at 568–69. Moreover, if the Union were later to file charges for breach of a collective bargaining agreement against one of the employers under an alter ego theory, as opposed to the single employer doctrine, the Board would probably have no occasion to reach the question of the

---

**5.** The employers raise the related argument that just because the Union had evidence of double breasting with regard to some of the companies, such as Boh Bros., Pratt-Farnsworth, and the Hebert Co., the Union should not be allowed to use this evidence as support for a request for information about the other companies. Indeed, the hearing before the ALJ reveals that the Union did not put on evidence of possible double breasting with regard to some of the ten respondent companies, at least specifically by name. This fact does not provide a valid defense to nondisclosure for those companies, however, for two reasons. First, the Laborde-Lemoine conversation gave the Union reason to believe there was double breasting by most, if not all, of the member contractors of AGC-New Orleans. Second, although it is unclear whether AGC-New Orleans constitutes a multi-employer bargaining unit here, it is clear that all of the companies bargain with the Union through the voice of AGC, and it is reasonable to suppose that the labor policies of the companies would be similar. Furthermore, as we emphasize repeatedly in the text, allowing the Union access to the information does not prove or conclude anything on the merits about the existence of double breasting; the information is, however, discoverable under the liberal, discovery-type standard set out in *Acme Industrial Co.*

**6.** Perrilliet-Rickey is not involved in the present litigation and yet one of the primary reasons the Union suspected double breasting with regard to the companies here is because of the conversation between Laborde and Lemoine recounted earlier in the text.

appropriateness of the representational unit. *Pratt-Farnsworth, Inc.,* 690 F.2d at 508–09.

■ The employers raise one final defense to disclosure of the information. They argue that the only possible reason that the Union desired the information was for organizational purposes, *i.e.,* for the purpose of "unionizing" the double breasted counterpart companies. The fact that the information might be helpful to the Union in an organizational campaign does not render it irrelevant for the purposes requested or otherwise excuse its nonproduction, however. *Associated General Contractors,* 633 F.2d at 772; *accord Utica Observer-Dispatch v. NLRB,* 229 F.2d 575, 577 (2d Cir. 1956).

In conclusion, we agree with the Board that the Union's request was one for relevant information, that the employers have not shown any persuasive reasons for nondisclosure, and that their failure to disclose constitutes an unfair labor practice under §§ 8(a)(1) and (5) of the National Labor Relations Act. Accordingly, it is ordered that the Board's order be in all respects

ENFORCED.

GARWOOD, Circuit Judge, dissenting:

I respectfully dissent. As to seven of the ten respondents (*e.g.,* all respondents other than Hebert, Farnsworth and Boh), it is plain to me that the complainant Carpenters Union wholly failed to discharge its admitted burden of "showing . . . relevance and need" and "failed to show that the information was actually relevant to the situation as it then existed," as its evidence amounted to no "more than mere 'suspicion or surmise'." *San Diego Newspaper Guild Local No. 95 v. N.L.R.B.,* 548 F.2d 863, 868 (9th Cir.1977). *See also N.L.R.B. v. Temple-Eastex, Inc.,* 579 F.2d 932, 937 n. 1 (5th Cir.1978).

With respect to these seven respondents, the Union relied primarily on the testimony of its business agent Laborde as to what Lemoine, an officer of Perrilliet, a contractor *not* a respondent herein, had told La-

borde in a conversation occurring more than a year before the Union sent the letters in question. According to Laborde, Lemoine said Perrilliet had formed a nonunion "double-breasted" company in order to "compete against" "the other contractors who had agreements with us" that had done so, "and he named a bunch of them that had the double-breasted companies." There is no indication that any of these respondents were among the companies named by Lemoine. As it was the Union's burden to show its entitlement to the information requested of these respondents, and as what Lemoine said was peculiarly within the knowledge of the Union officer and witness Laborde, the only fair assumption is that Lemoine did *not* include any of these respondents among the "bunch of" double-breasted contractors he identified. If this indicates anything, it is that these respondents were *not* engaged in the practice the Union sought to investigate.

The other "evidence" relied on by the Union respecting these seven respondents is that they, in common with the other respondents, were members of the New Orleans AGC, and that there were indications several AGC members, not including any of these seven respondents, had "double-breasted" companies. There is not a shred of evidence, however, that the practices of AGC members in respect to a matter such as this were normally uniform. Indeed, there is no evidence whatever as to the degree of uniformity or diversity of practice in this or any similar regard among AGC members. The majority's statement (note 5) that "it is reasonable to *suppose* that the labor policies of the companies would be similar" (emphasis added) is without any support in the record, and is the kind of guilt-by-association approach which our courts have so long and so vigorously eschewed. If this is not "mere 'suspicion or surmise'," then what do these words mean?

Reliance in this respect on *N.L.R.B. v. Associated General Contractors,* 633 F.2d 766 (9th Cir.1980), *cert. denied,* 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981), is wholly misplaced. In the *AGC* case, there

was a multiemployer bargaining unit, and the AGC was *the party* with which the Union contracted. Evidence indicating that some of the AGC members, who were covered by this contract, engaged in "double breasting" was held to justify the Union's request for information *from the AGC.* In other words, there was evidence of "double breasting" for which the party from whom the information was sought was contractually responsible to the Union requesting the information. Here, by contrast, the Board, in the order which the majority enforces, has found "insufficient evidence to establish the existence of a multiemployer bargaining unit." Moreover, none of the requests for information here in issue were made to the New Orleans AGC, and it is not even a respondent. Rather, the requests were made severally to the individual respondent companies, and they individually and severally are respondents in this unfair labor practice proceeding. So far as this record shows, we have treated General Motors and Chrysler just like Chevrolet and Pontiac.

There are other glaring deficiencies in the proof. Not only is there no evidence of any "double breasting" by these seven respondents, there is indeed no evidence whatever of any relation between them and their respective assumed siblings concerning whom the Union made inquiry. Nor is there any showing that the assumed siblings employ any carpenters or are even in the construction business.

The majority purports to recognize the settled distinction between information normally intrinsic to the employer-employee relationship, which is considered presumptively relevant, with the employer having the burden to show otherwise, and information, such as that here sought, which is not ordinarily pertinent to the Union's relationship *with the employer from whom it is requested,* but may be relevant due to the existence of particular special circumstances, as to which the Union has the initial burden of showing relevancy. However, if this distinction has any validity and subserves any purpose, then in the second class of case some character of showing, beyond "mere 'suspicion and surmise'," must be re-quired of the Union in regard to the particular employer from whom the information is sought and who is made respondent in the unfair labor practice proceeding. Since no such showing has been made as to these seven respondents, I respectfully dissent.