**WALTER N. YODER & SONS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Sheet Metal Workers' International Assoc., Local 100, Intervenor.

No. 84–1580.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1985.

Decided Feb. 15, 1985.

Lawrence E. Dube, Jr., Baltimore, Md. (John G. Kruchko, Towson, Md., on brief), for petitioner.

Andrew F. Tranovich, Washington, D.C. (Wilford W. Johansen, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief), for respondent.

Richard M. Resnick, Washington, D.C. (Sherman, Dunn, Cohen, Leifer & Counts, P.C., Washington, D.C., on brief), for intervenor.

Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Walter N. Yoder & Sons, Inc. (Yoder) petitions for review of a National Labor Relations Board (NLRB or Board) order commanding it to cease and desist an unfair labor practice—withholding from Local 100 of the Sheet Metal Workers' International requested information necessary for the union to negotiate or enforce a collective bargaining agreement. Reviewing the Board's order under section 10(f) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(f), we conclude that there was substantial evidence to support the Board's finding that Yoder committed an unfair labor practice. Accordingly, we affirm the Board's findings and enforce the order against the petitioner.

I

Yoder is a Cumberland, Maryland construction firm that engages in part in plumbing and heating contracting. As a member of the Western Maryland Mechanical Contractors Association, it was a signatory to a collective bargaining agreement with the Sheet Metal Workers' International Association. In March 1982, Richard Drake, president of Local 100, opened negotiations with the Contractors' Association in order to reach an agreement to replace the contract due to expire on April 30, 1982. Drake announced at that time that he believed Yoder and another company were operating non-union alter ego firms, but that he would not raise those allegations as an issue in the negotiations nor would the allegations prevent ratification of any agreement reached.

Shortly thereafter, on March 25, 1982, Drake wrote the Yoder Company and repeated his allegation that Yoder was operating Potomac Metal & Supply, Inc., a non-union sheet metal firm. Attached to his letter were fourteen interrogatories concerning the ownership, corporate structure, business, and personnel of the two firms. Drake asserted in the letter that the information was "sought solely to enable us to apply and enforce the terms of our collective bargaining agreement with you."

Yoder responded by answering two of the interrogatories dealing with subcontracts and assignment of subcontracts. Yoder declined to answer any of the remaining questions on the grounds that the union failed to identify a need for the information and failed to establish its relevance to the bargaining agreement. Yoder denied any violation of the contract.

On April 19, 1982, Drake met with John Yoder to discuss the problem. Yoder told Drake that the two companies were not in the same business because Yoder was a construction firm whereas Potomac was a manufacturer of sheet metal products. Mr. Yoder admitted that Potomac did some repair work on Yoder's trucks, but that it did not fabricate sheet metal for Yoder. Mr. Yoder also told Drake that Yoder employees sometimes used equipment in Potomac's shop, but only because the equipment was specialized and Yoder did not trust Potomac employees to do the job. At a later meeting that day, Yoder employees confirmed Yoder's latter assertion.

No further correspondence passed between the union and the company, and on April 30, 1982, the union filed a grievance with the NLRB, alleging a violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) & (5). The Regional Director issued a complaint and notice of hearing and the case duly came before an ALJ for hearing.

At the hearing Drake was the only witness to testify in support of the grievance. He asserted that his request to Yoder for information was based on his belief that Yoder was engaged in a "double-breasted" operation. John Wilkinson, a business manager for one of the preconsolidation locals, had informed him that Yoder employees had reported an integration of operations between Yoder and Potomac; specifically, Wilkinson had reported that Yoder employees were working in Potomac's shop and that Potomac had fabricated sheet metal for Yoder. Based on these reports from Wilkinson, Drake had initiated an investi-

gation and discovered that Yoder and Potomac had the same set of officers and directors. Furthermore state records described Potomac as a plumbing and sheet metal firm and Yoder as a plumbing and heating firm, indicating a similarity in their businesses. Drake also testified that after making the request, he saw Potomac mentioned in the Dodge Report, a trade publication that reported bids on various projects, thereby indicating that Potomac was in construction, directly contrary to Yoder's assertion that Potomac was purely a manufacturer.

Yoder testified on behalf of the company and reasserted that Yoder's operational involvement with Potomac was confined to specialized jobs Yoder was not equipped to perform. Mr. Yoder also asserted that he had encouraged the union to question his employees because they could establish that there was no interrelationship of employees or operations.

The ALJ found on the basis of this evidence that the union had a reasonable belief that Yoder was operating Potomac as an alter ego company. The requested information concerned the very facts which would establish an interrelated operation. Because establishing the alter ego relationship would be a basis for legal action by the union to enforce the contract in regard to Potomac employees, the information sought was relevant to the union's enforcement of the collective bargaining agreement. Therefore, concluded the ALJ, the company had violated §§ 8(a)(1) and (5) of the Act. He then ordered the company to answer the interrogatories.

The company appealed to the Board for review of the ALJ proceeding. The Board found no error in the ALJ's findings or conclusions of law, and affirmed the order with only a slight modification to reflect that two of the interrogatories had already been answered.

## II

The question before us is simply whether there is substantial evidence in the record to support the ALJ's findings as adopted by the Board. Preliminarily, the petitioner challenges the admission of much of Drake's testimony at the hearing and asserts that the ALJ unduly restricted cross-examination of Drake. We find no merit in either assertion.

■■■ The petitioner challenges much of Drake's testimony as hearsay since it concerns reports made to him by others. The Board is bound by law to conduct its hearings "so far as practicable" in accordance with the Federal Rules of Evidence and may not base factual findings solely on hearsay evidence. 29 U.S.C. § 160(b); *Union Drawn Steel Co. v. NLRB*, 109 F.2d 587 (3d Cir.1940). However, the ALJ was clearly correct in ruling that Drake's testimony concerning reports made to him was not hearsay. The evidence of these reports was offered not to establish that there was in fact an alter ego company, but rather to establish that Drake's request was not totally unfounded. *See San Diego Newspaper Guild, Local 95 v. NLRB*, 548 F.2d 863 (9th Cir.1977). That the reports were made was the probative fact for which the testimony was offered; the truth of the reports did not bear on the issue before the ALJ. The evidence was therefore properly admissible for the purpose offered. Fed.R.Evid. 801.

■■ Yoder further complains that the ALJ denied the company the right to cross-examine Drake concerning "what else he knew about the two companies and what else he could have determined by easy inquiry if he had genuinely been interested in investigating the contract violation." A review of the hearing transcript reveals that the ALJ curtailed cross-examination concerning information relayed to Drake by Yoder at the April 19 meeting and concerning Drake's knowledge of whether the union had ever attempted to organize the Potomac employees. We perceive no such relevance to either area of inquiry that the ALJ's exclusion of the testimony could constitute an abuse of discretion, and we therefore reject this contention.

Whether or not John Yoder explained that Potomac did specialized metal bending for Yoder just as it did for other companies has no bearing on the union's belief that an alter ego company was being operated. The Act contemplates that the union may request and receive from the employer information necessary to enforce the agreement. *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979). The union need only make a formal request based on a reasonable belief that the information is necessary and show that it is relevant in order to trigger the employer's obligation to give the information. *See San Diego Newspaper Guild, Local 95 v. NLRB*, 548 F.2d at 866–68. The remedial scheme fashioned by Congress, the NLRB, and the courts clearly contemplates that the union need not be satisfied with the employer's assurances that there is no violation once the duty to provide the information has been triggered. *See NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 152–53, 76 S.Ct. 753, 755–56, 100 L.Ed. 1027 (1956). Therefore, once the duty had been triggered, the reasonableness of Drake's belief in making the request may not be called into question in light of post hoc information provided by the employer outside the confines of a formal response to the request.

Drake's knowledge of Potomac's labor relations history is likewise irrelevant. If Potomac were shown to be an alter ego of Yoder, then the contract would apply to Potomac employees whether or not the union has previously considered them to be appropriately included in the bargaining unit. *See Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 508–09 (5th Cir.1982). If the union were to proceed on a single-employer theory, the fact that the union might have previously considered Potomac employees not properly within the appropriate unit would not preclude it from seeking to include them now. Logically Drake's belief that a violation of the contract was being committed now would not be affected by any previous union failure to organize the Potomac employees.

Having established that all the evidence was properly before the ALJ, we reach the crucial issue—was the evidence substantial enough to support the ALJ's findings that the information was relevant to enforcing a contract.

The union bears the burden of establishing the relevance of the requested information, *NLRB v. Leonard B. Herbert, Jr. & Co.*, 696 F.2d 1120, 1124 (5th Cir. 1983), and enjoys no presumption of relevance when the information does not concern bargaining unit employees. *NLRB v. A.S. Abell Co.*, 624 F.2d 506, 510 (4th Cir. 1980). The standard of relevancy is a liberal, discovery-type standard, *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 437 & n. 6 (1967); therefore, information is relevant if it is germane and "has any bearing on the subject matter of the case." *Local 13, Detroit Newspaper Printing and Graphic Communications Union v. NLRB*, 598 F.2d 267, 271 (D.C.Cir.1979).

The practical burden upon the union then is to show that the information will aid investigation of contract violations "where the union has established a reasonable basis to suspect such violations have occurred." *NLRB v. Associated General Contractors*, 633 F.2d 766, 771–72 (9th Cir. 1980); *see also San Diego Newspaper Guild, Local 95 v. NLRB*, 548 F.2d 863. "Actual violations need not be established in order to show relevancy." *NLRB v. Associated General Contractors*, 633 F.2d at 771 & n. 6.

To establish a contract violation in the respect identified, the union would have to show that Yoder and Potomac were either a single employer or alter ego companies. Relevant facts considered by the courts on the single employer issue are (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85

S.Ct. 876, 877, 13 L.Ed.2d 789 (1965); *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d at 504. The same facts are relevant to the alter ego question; the court's inquiry focuses on "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership." *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d at 507. To establish that the information was relevant, the union must show that it had a reasonable belief that enough facts existed to give rise to a reasonable belief that the two companies were in legal contemplation a single employer.

■ Substantial evidence supports the Board's finding on the critical facts establishing relevancy for the purpose at hand. Wilkinson reported to Drake that Yoder employees had told him that some of their number had worked at the Potomac shop. Those reports were confirmed in conversations with a Yoder superintendent and the Yoder union steward. Those reports led Drake to instigate an investigation into the state's corporate records which revealed that the two companies had common officers and directors and that they were in the same general business. All of the information within Drake's knowledge pointed to a single employer or alter ego situation and gave rise to a reasonable belief that the contract might well be applied to Potomac employees. The information sought from Yoder, bearing as it did on the factors above summarized, was certainly relevant to enforcing that contract.

■ Yoder argues that the omission from the record of the contract in effect at the time of the request is fatal to the Board's findings. We disagree. The parties agree that there was a contract in effect at the time, and the record contains the agreement entered into on May 1, 1982. The purpose of the request was to apply the whole contract to the Potomac employees; the relevancy inquiry therefore concerned only whether there was an agreement to enforce, not whether some particular provision had been violated. The record reveals that Yoder was signatory to an agreement at all times relevant to this action.

Therefore, we hold that on the record as a whole, the findings of the Board are supported by substantial evidence, and that the Board is therefore entitled to enforcement of its order.

ENFORCED.