United States Court of Appeals,

Fifth Circuit.

No. 95-60273.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CJC Holdings, Inc., Respondent.

Oct. 16, 1996.

On Application for Enforcement of an Order of the National Labor Relations Board.

Before REYNALDO G. GARZA, DEMOSS and PARKER, Circuit Judges.

PER CURIAM:

The National Labor Relations Board ("NLRB" or "the Board") filed an Application for Enforcement of its December 16, 1994 order requiring Petitioner, CJC Holdings, Inc. ("CJC") to provide the Union a seniority list and to bargain with the Union in good faith pursuant to the terms of the collective bargaining contract. CJC contends that the NLRB's order is not supported by either the law or the evidence in the record as a whole and asks this Court to deny enforcement. After reviewing the record and the applicable law, we conclude that the petition for enforcement should be granted.

I. FACTS

CJC manufactures jewelry in Austin, Texas. The company has recognized Local 1751, United Brotherhood of Carpenters and Joiners of America, AFL-CIO (the "Union"). The most recent contract

1

between CJC and the Union was a five-year contract running from June 7, 1989 to June 6, 1994.

The contract permitted the Union to request a seniority list from the company every three months to find out about new employees and to update its records. By letter dated March 5, 1992, the union president requested from the company a seniority list of all employees, including their addresses, dates of hire, pay rates, and social security numbers. One reason for the Union's request for employees' addresses was that over 60 copies of its February 1992 newsletter had been returned by the post office because of incorrect addresses. The company refused to provide employee's addresses, stating only that it was not obligated to do so.

The contract also provided for a renegotiation of wages for the final two years of the contract:

> The wage rates to be paid from the first work day of the first pay period in June 1992 to June 6, 1994 ... are subject to negotiation if either party gives written notice ... at least sixty (60) days prior to the third anniversary (June 7, 1992), of the effective date of the Agreement. If no agreement is made, or if impasse occurs, all terms of this Agreement shall remain unchanged.

On April 1, 1992, the Union business representative gave notice that the Union wished to exercise its option to reopen negotiation of wages under this provision. The company agreed to meet for this purpose, and the parties did so on June 1, 1992.

On June 11, 1992, CJC refused to negotiate further, claiming that the contract provision on mid-term wage negotiations required agreement on or before June 7, 1992 to avoid continuation of the

existing wage rates.

## II. PROCEEDINGS AND DISPOSITION BELOW

In April and July 1992, the Union filed charges regarding the disputes discussed above. The Regional Director of the NLRB issued a consolidated complaint, and the matter was tried before an administrative law judge ("ALJ") of the NLRB. On September 23, 1993, the ALJ ruled that CJC had unlawfully refused to comply with the Union's March 1992 request for employees' addresses, and unlawfully refused to bargain with the Union regarding wages after June 7, 1992. The ALJ ordered CJC to provide the Union the seniority list requested, to bargain in good faith concerning the midterm wage increase and to post a notice to the employees concerning the ALJ's rulings.

On December 16, 1994, the Board affirmed the ALJ's decision and adopted the ALJ's proposed order. CJC did not seek review, and claims to have complied with the Board's order. On May 8, 1995, the Board filed its Application for Enforcement with this Court. In response, CJC challenged the Board's application for enforcement, as well as the basis for the Board's decision.

## III. ANALYSIS

1. Has the Order become moot?

CJC contends that the passage of time and its compliance with the Board's Order have rendered the Order pointless and obsolete. Therefore, CJC contends, enforcement of the order cannot be said to effectuate the policies of the National Labor Relations Act, and

3

the application for enforcement should be denied.  This contention is meritless.

In *N.L.R.B. v. Mexia Textile Mills, Inc.,* 339 U.S. 563, 567-68, 70 S.Ct. 826, 828-29, 94 L.Ed. 1067 (1950), the Supreme Court observed:

> We think it plain from the cases that the employer's compliance with an order of the Board does not render the cause moot, depriving the Board of its opportunity to secure enforcement from an appropriate court....  A Board order imposes a continuing obligation;  and the Board is entitled to have the resumption of the unfair labor practice barred by an enforcement decree.

The Court reaffirmed this view in *N.L.R.B. v. Raytheon Co.,* 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970).  Following *Mexia Textile,* this Court has observed that "The Board has discretion in asking the courts to enforce its orders.  It is not compelled by statute to seek enforcement.  Within a reasonable discretion, the Board is entitled to judicial enforcement of its orders even in cases where the offending parties have already complied with the orders."  *N.L.R.B. v. The Great Atlantic & Pacific Tea Company, Inc.,* 407 F.2d 387, 388 (5th Cir.1969).

Although in *Raytheon,* the Supreme Court noted that an enforcement proceeding could become moot if a party establishes that there is no reasonable expectation that the wrong will be repeated, the Court rejected application of that exception to the general rule, stating:

> [T]his is not such a case.  Nothing in the record here shows that the specific acts complained of have not been repeated or

4

> gives any assurance that they will not be repeated in the
> future.

398 U.S. at 27-28, 90 S.Ct. at 1549.

In the present case, there is no evidence that the unfair labor practices complained of will not be repeated in the future. Indeed, although CJC contends that it has complied with the Board's order, a subsequent NLRB decision indicates that CJC's relationship with the Union continues to be tainted by bad faith. *CJC Holdings, Inc. and United Brotherhood of Carpenters & Joiners of America, Local 1751,* Case 16-CA-16778-2 (Aug.1995), *modified and aff'd,* 320 NLRB No. 122, 1996 WL 142553 (1996). In addition, the Board's review period in this case was a reasonable 14 months. Although CJC asserts that enforcement of the Board's order would not effectuate any policies of the Act, it falls short of demonstrating this contention.

2. Duty to provide employee addresses.

CJC contends that its refusal to provide the Union with a list of employees' addresses could not violate the NLRA because the Union did not need the addresses for a purpose relevant to the Union's proper performance of its duties.

Under the section 8(a)(5) duty to bargain, an employer has a duty "to provide information that is needed by the bargaining representative for the proper performance of its duties." *N.L.R.B. v. Leonard B. Hebert, Jr. & Co., Inc.,* 696 F.2d 1120, 1124 (5th Cir.1983) (quoting *N.L.R.B. v. Acme Industrial Co.,* 385 U.S. 432,

5

435-36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967)). "An employer's refusal to furnish information relevant to a union's negotiation or administration of a collective bargaining agreement may constitute a breach of the employer's duty to bargain in good faith...." *Id.* This Court elaborated:

> the key inquiry is whether the information sought by the Union is relevant to its duties. The Supreme Court has adopted a liberal, discovery-type standard by which relevancy of requested information is to be judged. Information intrinsic to the employer-union relationship, such as that pertaining to wages and other financial benefits, is considered presumptively relevant, with the employer having the burden of showing irrelevance. Where, however, a union seeks information not ordinarily pertinent to its performance as bargaining representative, but alleged to have become relevant due to particular circumstances, no presumption exists and the union has the initial burden of establishing relevancy before the employer must comply.

*Id.* (internal citations omitted).

The Fifth Circuit has not expressly held that employee addresses are presumptively relevant. However, the Second Circuit has observed that this kind of information

> has an even more fundamental relevance than that considered presumptively relevant.... [D]ata without which a union cannot even communicate with employees whom it represents is, by its very nature, fundamental to the entire expanse of a union's relationship with the employees. In this instance it is urgent so that the exclusive bargaining representative of the employees may perform its broad range of statutory duties in a truly representative fashion and in harmony with the employees' desires and interests. Because this information is therefore so basically related to the proper performance of the union's statutory duties, we believe any special showing of specific relevance would be superfluous.

*Prudential Ins. Co. of America v. N.L.R.B.,* 412 F.2d 77, 84 (2d Cir.1969).

6

CJC concedes that employee addresses are presumptively relevant, but argues that they should be allowed to rebut the presumption with evidence that the Union failed to give any reason for seeking employee addresses, and that the Union was able to communicate with employees through meetings, bulletin boards, distribution of flyers, and through its steward system. This argument fails as the record indicates that the Union needed the employee addresses to update its newsletter mailing list.

CJC also argues that the NLRB denied its due process rights by refusing to consider evidence that the Union's request was for the purpose of soliciting employees to join a legal action under the Fair Labor Standards Act. The ALJ and the Board refused to consider this evidence because they considered it irrelevant. In his decision, the ALJ opined that the Union's desire to communicate with employees regarding possible problems with a Department of Labor-approved settlement of F.L.S.A. claims was completely appropriate and did not demonstrate bad faith as CJC contends. CJC does not cite any authority that would support a contrary conclusion. In a similar context, this Court has held that "[t]he fact that the information might be helpful to the Union in an organizational campaign does not render it irrelevant for the purposes requested or otherwise excuse its nonproduction...." *Leonard B. Hebert,* 696 F.2d at 1126. The possibility that a union may use relevant information for a purpose the employer finds

7

objectionable is no justification for withholding it.

3. Mid-term wage negotiation.

CJC contends that the Board's interpretation of the mid-term wage negotiation clause was in error, and that CJC was not required to negotiate regarding wages after June 7, 1992. Therefore, CJC argues, its refusal to negotiate after that date could not be an unfair labor practice. No reasonable interpretation of the mid-term wage negotiation clause supports this contention.

As the ALJ noted, the contract allowed for the negotiation of new wage rates for the last two years of the contract, if either party gave written notice at least 60 days prior to June 7, 1992.

> That language only sets a deadline by which the notice must be given. It simply allows the parties adequate notice for the purpose of beginning midterm negotiations. The second sentence, referring to what will happen in the event no agreement is reached, does not say that the agreement must be finalized by June 7. It only says that if an agreement is not reached or an impasse results, the wages will remain as they stood on that anniversary. Nothing prevents the parties from bargaining after June 7 and nothing prohibits the parties from reaching agreement on new wage rates....

The ALJ was correct, and CJC does not explain how this clause could be read to support its contention.

On appeal, CJC attempts to recharacterize its actions as merely standing firm on its initial proposal. However, it is clear that CJC did not declare an impasse. It is also clear that CJC relied on its erroneous interpretation of the contract provision in refusing to meet with the Union again after June 7.

CJC complains that the ALJ's refusal to consider

8

extra-contractual evidence regarding the meaning of the contract language was a violation of its due process rights.  The ALJ gave CJC the opportunity to demonstrate an ambiguity in the meaning of the language.  Correctly finding that there was no ambiguity, patent or latent, the ALJ prohibited CJC from offering evidence to alter or vary the terms of the integrated written contract term.

## IV. CONCLUSION

For the foregoing reasons we grant the application for enforcement of the Board's order.

ENFORCED.

9