LOCAL 594, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURE IMPLEMENT WORKERS OF AMERICA, UAW, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 84–5962, 84–6086.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 1, 1985.

Decided Nov. 12, 1985.

Carlton R. Roeser, argued, Robert L. O'Connell and Associates, Pontiac, Mich., for petitioner.

Elliott Moore, Daniel Pollitt, argued, Deputy Associate Gen. Counsel, Washington, D.C., for respondent.

Before MERRITT and WELLFORD, Circuit Judges, and, CELEBREZZE, Senior Circuit Judge.

PER CURIAM:

This case is before the court on the petition of Local 594, International Union, United Automobile, Aerospace and Agriculture Implement Workers of America, UAW, (Union) to review and set aside an order of the National Labor Relations Board (Board) issued on September 28, 1984, and reported at 272 NLRB No. 110. The Board has filed a cross-application for enforcement of its order against the Union, and we have jurisdiction of this case under Section 10(e) and (f) of the National Labor Relations Act (the Act).

The Board found that the Union violated Section 8(b)(1)(A) and (b)(2) of the Act, 29 U.S.C. § 158(b)(1)(A) and (b)(2), by causing the General Motors Corporation (G.M.) to refuse to pay employees Otis Miracle and Marvin Code for certain hours they worked as union benefit representatives prior to their regular shift due to protected activity of Otis Miracle. The Board further found that the Union violated Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A), by withdrawing grievances filed by Miracle in retaliation for Miracle's protected activity. The alleged unfair labor practices occurred at one of the G.M. plants located at 660 South Boulevard East, Pontiac, Michigan.

The Union represents G.M. production and maintenance employees at the plant in question. The collective bargaining agreement between G.M. and the Union provided for the appointment of local union benefit representatives to represent unit employees concerning issues arising from contractually provided fringe benefits, such as retirement benefits, life and health insurance, and supplemental unemployment benefits. The contract also specified the amount of time the representatives could spend per day on claims work, the payment for work performed on a shift other than the representative's regular shift, and the circumstances under which benefit representatives could work overtime.

Miracle and Code served as Union benefit representatives for some 3,000 employees on the second and third shifts. Miracle had functioned as a benefit representative since the early 1970s; Code was appointed in 1977. The second shift employees they represented worked from 4:00 p.m. to 12:30 a.m., most third shift employees started their shift work between 10:00 and 10:30 p.m.

G.M. maintained a separate claims office at the plant staffed by company claims representatives who processed the claims about which Miracle and Code were concerned as union representatives. Company representatives worked from 8:00 a.m. to 4:00 p.m., or from 9:00 a.m. to 5:00 p.m., and the office closed at 5:00 p.m. normally. The ALJ and the Board found the following facts in substance as a basis for their conclusion in this case:

Beginning in late 1980, Miracle and Code started to report to work at 2:00 p.m., and to complete their shift at 10:30 p.m. Between 2:00 p.m. and 4:00 p.m., Miracle and Code met with Company claims representatives to consider claims of individual employees. Miracle and Code generally met with G.M. claims representatives as the need arose, although occasionally they scheduled prearranged meetings. Until June 1982, G.M. paid Miracle and Code for their work between 2:00 p.m. and 4:00 p.m. They performed overtime work only if employees in their assigned department worked overtime, and they were paid at the overtime rate for hours worked after 10:30 p.m.

In early 1982, G.M. and the Union agreed to a new joint absenteeism program designed to address the problem of excessive absenteeism by G.M. employees. Three members from management and three members from the Union were to review absentee records of employees and to recommend a penalty for abuse of leave privileges. The new program also provided new penalty procedures for violations of the absentee program.

Around the end of March 1982, Local Union President Donald Douglas called a

meeting of all the representatives in the plant to announce that the new absenteeism program would take effect on April 19. During this meeting, Miracle expressed his opposition to the new program's penalty procedure and to the fact that committee members would have access to employee medical records and have the power to decide the penalty to be imposed on employees. Afterward Miracle also complained about the new absentee program to other union representatives, employees in the plant, and also to management officials.

On April 30, Douglas approached Miracle at work and stated, "I hear you have been chopping the program, talking about the absenteeism program." Miracle stated that he had given his opinion of the program to a number of people. Douglas responded to the effect that he would "get even."

Around the same time Douglas, Union Shop Committee Chairman Krieger, and Union Secretary Campbell went to G.M. Superintendent Watkins and asked to examine Miracle's overtime work records, and inquired about his hours. Watkins stated that Miracle's starting time was 2:00 p.m., and showed the union officials Miracle's overtime records, which indicated that Miracle's overtime work was in accordance with the collective bargaining agreement.

Krieger telephoned Miracle at work and asked when Miracle started work each day. Miracle responded that he started around 2:00 p.m., and Krieger stated that he was going to change that, and his overtime situation as well. Later Miracle joined Krieger and Union Secretary Campbell at their table in the cafeteria. When Miracle sat down Krieger advised him that they had seen Watkins and obtained "the information that they wanted" inferring that this was in accord with Douglas' instructions.

That same evening, Foreman Jerry Miracle[1] approached Otis Miracle and informed him that Superintendent Watkins wanted to see him. Watkins informed Miracle that Douglas, Campbell, and Krieger had been checking on his starting time and his overtime. Miracle asked Watkins what he was planning to do, and Watkins replied that he was not going to do anything until he received directions from the G.M. labor relations department.

Shortly thereafter, Douglas contacted G.M. Personnel Administrator Winkler and stated that there had been complaints about Miracle's overtime and that Miracle was starting work at 2:00 p.m. rather than 4:00 p.m. Winkler agreed to look into the matter and directed G.M. Labor Relations Representative Robinette to investigate the situation.[2] After the Robinette investigation, Winkler concluded that the overtime Miracle was working was legitimate under the collective bargaining agreement, and that both Miracle and Code were beginning their work at 2:00 p.m.

Winkler then telephoned Douglas and informed him of the conclusion he had reached after investigating Miracle. Douglas requested that Winkler change the hours back to 4:00 p.m. Winkler replied that he would not "single Miracle out and change his starting time without changing Code's."

G.M. later informed both Miracle and Code that their starting time would be changed to 4:00 p.m. Promptly Miracle and Code approached G.M.'s Robinette and asked if he had instructed Watkins to change the starting time. While Robinette answered affirmatively, he refused to put this in writing. Miracle and Code immediately pursued the matter with Winkler, who also refused to state in writing his authorization. Both Miracle and Code, nonetheless, continued to begin work at 2:00 p.m., and G.M. docked their pay for the hours between 2:00 p.m. and 4:00 p.m.

When asked by Winkler to explain his actions, Code responded that he was continuing to begin at 2:00 p.m., and that he was conducting official business between

---

1. Jerry Miracle is not related to Otis Miracle.

2. Miracle had once before been fired for falsifying a time card.

2:00 p.m. and 4:00 p.m.; he produced documents supporting his position. Code also told Winkler that Miracle continued to begin his shift at 2:00 p.m. Winkler then instructed Robinette to pay Code for the hours he had worked between 2:00 p.m. and 4:00 p.m. and that Code could continue to start work at 2:00 p.m. Douglas knew about Code's situation and shortly thereafter advised him that his hours would probably be changed back to 4:00 p.m., but that it "was nothing against" Code: Douglas explained that "[h]e wasn't after [Code] for anything" but that he and Kreiger "were after ... Miracle." Douglas added that he would deny this if Code repeated it to anyone.

From June 15 through July 30, both Code and Miracle continued to begin their shift at 2:00 p.m., carrying out their duties as benefit representatives and meeting with management claims representatives concerning claims issues, but only Code was paid for his work between 2:00 p.m. and 4:00 p.m.

An International Union representative then contacted Winkler about the starting times of the second shift benefit representatives. Winkler explained that their starting times had been changed from 2:00 p.m. to 4:00 p.m. at the urging and request of the Local. At the International's request the starting times were changed back to 2:00 p.m. The Local Union continued, however, to press for a 4:00 p.m. starting time.

Between June 25 and September 5, Miracle filed seven separate grievances with union committeeman Steger against G.M. Six concerned its failure to pay him for his time worked between 2:00 p.m. and 4:00 p.m. The seventh alleged discrimination against Miracle.

After Steger told Miracle that Douglas wanted him to start work at 4:00 p.m. he passed Miracle's grievances on to union representative Forester. During August, Forester met with Miracle to discuss the grievances. Forester seemed optimistic about his chances of success. Thereafter, Miracle spoke to Forester frequently and Forester repeatedly assured Miracle that

he was going to win the grievances. In early October, however, Forester told Miracle that he had referred the grievances to Union Shop Committeeman Krieger.

In December Forester told Miracle that he had withdrawn Miracle's grievances, which had been returned to him by Krieger. Receiving no satisfactory explanation for withdrawing the grievances, Miracle insisted that the grievances be processed. Forester responded that he had settled one of the grievances, and that Miracle would be paid for three straight time hours and one hour overtime. Miracle protested this action to Forester. These facts heretofore recited were based largely on Miracle's testimony adopted by the ALJ as credible.

Miracle, in any event, continued to begin his work at 2:00 p.m. and was paid for the hours he worked between 2:00 p.m. and 4:00 p.m. until the end of January, 1983. At that juncture, Code was told by his G.M. foreman not to come to work under any circumstances before 4:00 p.m. Code, however, also continued to report to work at 2:00 p.m. but was not paid therefor prior to 4:00 p.m. Miracle and Code thereafter met with the International Union Director of Benefits, Douglas, Forester, and Campbell. Douglas stated that he had problems with Miracle starting his shift at 2:00 p.m., because Miracle was in effect setting his own shift. The International Representative told Douglas that he would request pay for Miracle for the hours in dispute. Douglas expressed his disagreement.

In February 1983 a meeting was held between representatives of the International Union and G.M. officials on this continuing problem. The International representative supported Miracle's position, but G.M. insisted on a starting time of 4:00 p.m. when the shift normally reported. Thereafter, Miracle and Code, pursuant to instructions from their supervisors, began working from 4:00 p.m. to 12:30 a.m.

Based on these facts, the ALJ found that the Union violated Section 8(b)(1)(A) and (b)(2) of the Act by causing G.M. to discontinue its practice of permitting Miracle and Code to begin their work as benefit repre-

sentatives prior to the start of their regular shift in retaliation for Miracle's having engaged in activity protected by Section 7 of the Act.

The ALJ also found that the Union violated Section 8(b)(1)(A) of the Act by refusing to provide adequate grievance representation to Miracle and by arbitrarily withdrawing all but one of his grievances. The ALJ concluded:

I concur that Respondent-Union's processing of Otis Miracle's grievances concerning the change in his starting time and not receiving pay for the hours worked, was clearly a continuation of the Union's discriminatory treatment of Miracle. The handling of the grievances was perfunctory and shows that it was designed to validate the unlawful conduct of Local 594 President Douglas in originally requesting that Miracle's starting time be changed from 2:00 to 4:00 p.m.

. . . .

More importantly, in supposedly settling the grievances of Miracle on December 14, 1982, by withdrawing all but one of them, Carl Forester did not take into account the disparity in treatment between Code and Miracle. It is undisputed that Marvin Code was paid for the hours between 2:00 p.m. and 4:00 p.m. during the same time period covered by the grievances here in question regardless of whether the meetings he attended were pre-arranged with management. Douglas, in fact, approved the change in Code's starting time from 4:00 p.m. to 2:00 p.m. on or about May 24, 1982, and he admitted that he knew Code was being paid for the hours between 2:00 p.m. and 4:00 p.m. during this period. Carl Forester also admitted that he knew of the disparity in treatment between Miracle and Code before he settled the grievances.

The Board agreed with this conclusion on the Section 8(b)(1)(A) charge.

The ALJ rejected on the merits the Union's claim that neither Miracle nor Code exhausted their internal appeals before turning to the Board as the UAW Constitution requires. The Board declined to review this issue, holding that this contention was not raised by the Union until *after* the hearing before the ALJ and was thus untimely.

The ALJ entered an order awarding backpay to Miracle and Code, and requiring the Union to cease and desist from similar discriminatory practices and post various notices. The Board approved the order with minor modifications.

■ We affirm the Board in respect to the exhaustion of internal union remedies issue. Since the Union failed to raise this issue in a timely fashion before the ALJ, we hold that it waived this defense. *See Clayton v. International Union*, 451 U.S. 679, 683, 101 S.Ct. 2088, 2092, 68 L.Ed.2d 538 (1981); *Farmer v. ARA Services, Inc.*, 660 F.2d 1096, 1106 (6th Cir.1981); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Keco Industries v. NLRB*, 458 F.2d 1356, 1357 (6th Cir.1972). The Union, furthermore, attempted to rely on documentary evidence in this regard not presented at the hearing before the ALJ in violation of Board rules. We need not therefore decide whether further exhaustion effort was necessary because of hostility, undue delay, or for some other demonstrated good cause.

There is no dispute but that Miracle was engaged in protected activity within the meaning of the Act at the times in question.

■ The Union violates Section 8(b)(2) and (1)(A) of the Act (29 U.S.C. § 158(b)(2) and (1)(A) by attempting to cause an employer to discriminate in terms and conditions of employment against an employee in order to retaliate against that employee for protesting the Union's policies, questioning the official conduct of Union agents, or incurring the personal hostility of a Union official. *NLRB v. Tid-Bit Products Co.*, 620 F.2d 581, 582 (6th Cir.1980); *The Rust Engineering Co. v. NLRB*, 445 F.2d 172, 173–74 (6th Cir.1971); *NLRB v.*

*Operating Engineers Local 18,* 500 F.2d 48, 49 (6th Cir.1974) (per curiam).

 The Board's factual determinations as to motivation of a party are conclusive if supported by substantial evidence on the record considered as a whole, even if the court "might have reached a different result had the matter been before [it] *de novo." NLRB v. Buckhorn Hazard Coal Corp.,* 472 F.2d 53, 55 (6th Cir.1973). *See NLRB v. Tid-Bit Products Co.,* 620 F.2d 581, 582 (6th Cir.1980).

 We find the Board's ultimate actual determinations to be supported by substantial evidence as to both charges in this case. The Union made several requests of G.M. that it change Miracle's starting time and succeeded in causing the Company to change the starting times of both Miracle and Code. The record supports the Board's finding that the Union pressed G.M. to change Miracle's hours in retaliation for his opposition to the new Company-Union absenteeism program.[3] Direct evidence of the Union's purpose to retaliate against Miracle for his dissenting views is supported by circumstantial evidence. The evidence of Miracle's disparate treatment by the Union also provides an added basis for the Board's finding of unlawful motivation. *NLRB v. Florida Tile Co.,* 692 F.2d 34, 35 (6th Cir.1982), *cert. denied,* 464 U.S. 817, 104 S.Ct. 75, 78 L.Ed.2d 87 (1983). The credibility determinations made were not unreasonable under the circumstances, and the standard of review in this area is generally narrow. *Local Union No. 948, I.B.E.W. v. NLRB,* 697 F.2d 113, 118 (6th Cir.1982). The Union, as exclusive bargaining agent, is under a statutory duty

> to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Vaca v. Sipes,* 386 U.S. 171, 177–78, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967).

3. Regardless of the Union's feelings that the absenteeism program was useful and needed, Miracle had the right to protest this policy with-

 A union breaches its duty of impartial representation by not processing a grievance because an employee has differed with a union policy or an official while the employee is engaged in activity protected by the Act. *Abilene Sheet Metal, Inc. v. NLRB,* 619 F.2d 332, 347 (5th Cir.1980). There is sufficient evidence of the Board's findings to this effect in this case.

Accordingly, we AFFIRM the Board in all respects and DENY the Union's petition for review.

out retaliation despite his own past violation as to time and attendance records.