NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

Sheet Metal Workers International
Association, Local Union No. 20,
Intervening Petitioner,

v.

GEORGE KOCH SONS,
INCORPORATED,
Respondent.

No. 90–3345.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 5, 1991.

Decided Dec. 23, 1991.

**1326**

Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., Aileen A. Armstrong, Linda J. Dreeben, Nancy J. Gottfried (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., William T. Little and Steve J. Robles, N.L.R.B., Region 25, Indianapolis, Ind., for petitioner.

Barbara J. Baird, Fillenwarth, Dennerline, Groth & Baird, Indianapolis, Ind., for intervenor.

Arthur D. Rutkowski (argued), Bowers, Harrison, Kent & Miller, Evansville, Ind., for respondent.

Before WOOD, Jr., and MANION, Circuit Judges, and ROSZKOWSKI, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This case is before us upon application of the National Labor Relations Board (the "Board") to enforce its Decision and Order against George Koch Sons, Incorporated ("Koch"). The Board adopted the finding of the Administrative Law Judge (the "ALJ") that Koch failed to bargain collectively and in good faith with the Sheet Metal Workers International Association, Local Union No. 20 (the "Union") and thereby violated Section 8(a)(5) and (1) of the National Labor Relations Act (the "Act"). 29 U.S.C. § 158(a)(5) and (1). The Board found that these violations arose when Koch failed to respond to the Union's questionnaire and when Koch failed to provide the Union with information regarding its business relationship and interconnections with Alpha Industries. The Board concluded that the Union requested this information to determine whether Koch

was wrongfully diverting work to Alpha Industries, and it further concluded that this information was relevant to the Union's collective-bargaining duties. Therefore, in its Decision and Order the Board ordered Koch to provide the information requested.

## I.

## BACKGROUND

### A. *Relevant Facts*

Koch is an Indiana corporation that manufactures and assembles various products including industrial ovens, conveyors, paint finishing and coating equipment. The Union represents Koch's employees in collective-bargaining matters.

In about 1983, the Union began to suspect that Koch was diverting unit installation work to Alpha Industries and that Koch, in fact, operated Alpha Industries as a nonunion business. The Union, thereafter, began an investigation in an attempt to confirm these suspicions and, thereby, requested other local unions to help collect information about the possible diversion of work to Alpha Industries.

Pursuant to this investigation, in 1983 the Union obtained two 1983 Dun & Bradstreet reports regarding Koch and Alpha Industries. These reports indicate that J.J. Hunsinger was both a Director and Secretary of Alpha Industries and a Director, Vice President and Controller of Koch. As further evidence of Hunsinger's relations with both Koch and Alpha Industries, the Union also had in its possession Alpha Industries's Application for Certificate of Authority for the Commonwealth of Kentucky. This certificate listed J.J. Hunsinger as Alpha Industries's Secretary, Treasurer and Director. Hunsinger's listed address on this application was Koch's corporate address, not Alpha Industries's.

Mr. Harmes, the Union's business representative, who collected much of the information about the relationship between

---

* The Honorable Stanley J. Roszkowski, Senior District Judge of the Northern District of Illinois, sitting by designation.

Koch and Alpha Industries, received numerous reports indicating that Koch was diverting work to Alpha Industries. For example, in early 1983, Mr. Harmes spoke with Mr. Vinson about the relationship between Alpha Industries and Koch. Mr. Harmes asked Vinson, a former Alpha Industries employee, to memorialize this conversation in an affidavit. Mr. Vinson complied with this request. The Vinson affidavit states that "[d]uring all of the time I [Mr. Vinson] worked for Alpha Industrial Services, all of my checks for wages and for expenses were made out by Geo. Koch Sons, Inc." Exhibit GC–10. Vinson's affidavit further states that while working at Alpha Industries *all* the work he performed involved assembling and installing Koch's fabricated materials. Moreover, this affidavit goes on to explain that two of Alpha Industries's supervisors had told Vinson that Alpha Industries was started by Koch as "their own non-union company, because Geo. Koch Sons could not afford to send their union men on small jobs." *Id.*

The Union received further letters and affidavits in its investigation. For example, a former employee, Mr. Beliles, gave the Union an affidavit, dated November 9, 1987, indicating that he worked at seven different jobs for Alpha Industries where the equipment installed was fabricated by Koch. Another such letter, dated November 2, 1987, came from Mr. Praet. This letter was about Alpha Industries's installation of Koch equipment on an Illinois job. Another letter came from a union representative based in Milwaukee, Wisconsin. This union letter, dated October 29, 1987, describes two other jobs where Koch equipment was installed by Alpha Industries employees. Moreover, this letter makes reference to statements by purchaser personnel indicating that both the fabrication and the installation contracts on these two jobs were originally awarded to Koch, not Alpha Industries.

Furthermore, at the ALJ hearing, Peck, the Union President, testified about Alpha Industries's installation of Koch equipment in a 1985 job in Hartford City. According to Peck, he visited the site in 1985, and at that time he saw Koch labels on the equipment installed. While at the Hartford site, Peck spoke with Alpha Industries employees who told him that they were doing work subcontracted by Koch. Moreover, these workers discussed with Peck other jobs where they installed Koch equipment while working for Alpha Industries. Peck reported this to Keith Platt, one of the Union's representatives, who then reported to Mr. Harmes. Mr. Platt, after receiving this information, visited this same site. Indeed, Mr. Platt wrote an October 20, 1987 letter memorializing this 1985 visit to the Hartford site. In this letter Mr. Platt stated that he found six non-union Alpha Industries workers who spent five weeks installing Koch equipment at the Hartford site. The letter further states that the men said that Koch had subcontracted their services. Exhibit GC–12.

On approximately July 13, 1987, Koch and the Union began negotiations for a new collective-bargaining agreement because the then-current contract was due to expire. Specifically, the parties were negotiating a paint-finishing contract and a building-trades contract.

On July 21, in the second negotiation session, the Union gave Koch a six-page request for information ("questionnaire"). The questionnaire contained some eighty-eight items that dealt with Koch's business, the business operations of Alpha Industries, and the interrelationship of these companies. For example, in this questionnaire the Union asked for information regarding the identity of Koch and Alpha Industries's customers, the geographic area in which Koch and Alpha Industries do business, and businesses to whom Alpha Industries and Koch sell, rent, or lease equipment.

According to testimony before the ALJ, the Union wanted this information because it suspected that Koch was involved with double-breasted operations with Alpha Industries.[1] That is, as David Harmes, a

---

1. As the ALJ described in his decision, "'[t]he term double-breasted is used to describe contractors who operate two companies, one unionized and the other nonunionized or open-

Union representative, explained, since 1983 the Union has collected information indicating that "Alpha Industries has consistently followed George Koch Sons around the country installing their [Koch's] equipment." Transcript of Hearing before the ALJ at 22. David Harmes further testified that the Union felt that this information was relevant to the negotiations that occurred at the time of the request.

After receiving the six-page questionnaire, Koch's Vice President of Industrial Relations wrote Harmes and asked for an explanation of the Union's requests. On July 28, 1987, the Union responded by a hand-delivered letter. This letter states that the Union had "reason to believe" that Koch and Alpha Industries are "integrally related" and "perhaps on occasion sub-contract certain sheet metal items to each other." Exhibit GC–4. This letter further states that this information "could affect all of the provisions of the present labor agreement including Article II, the subcontracting clause." *Id.* Moreover, the letter states that the requested information is necessary "for the Union to engage in informed bargaining." *Id.*

Koch responded to this request in a July 30 letter, in essence stating that, because Koch did not own or control Alpha Industries, it did not have the requested information within its knowledge or control. Exhibit GC–5. Moreover, Koch denied that it and Alpha Industries were integrally related, and it denied that it subcontracted work to Alpha Industries. *Id.* However, in this letter, Koch admitted that Alpha Industries had on several occasions installed sheet metal products pursuant to separate purchase orders direct from customers. *Id.*

The Union, unsatisfied with this response, continued to press for full compliance with its questionnaire. Accordingly, the Union made numerous verbal requests for this information during negotiations that continued from July to November of 1987. In fact, one of Koch's company memoranda indicates that the issue of subcontracting was discussed at some length in at least two negotiation sessions. For example, Koch's memorandum about the September 28, 1987, negotiation session indicates that " '[t]he existence of union and non-union competition and its effect on KOCH's ability to obtain work was *discussed at length,* as was its relationship between Alpha [Alpha Industries] and GEORGE KOCH SONS, INC.' " ALJ Decision and Recommended Order at 5 (quoting Exhibit GC–11) (emphasis added). Moreover, this same memorandum states that at an October 7, 1987, meeting there was, once again, a discussion about non-union installation of Koch equipment. Exhibit GC–11. This memorandum further states that the Union made a specific accusation with regard to Alpha Industries's installation of Koch equipment at a job in Michigan. *Id.*

Koch did not provide the requested information to the Union during the twelve or so negotiation sessions that ensued from July to November 1987.[2] Consequently, the Union filed charges on October 26, 1987, alleging that this refusal violated Section 8(a)(5) and (1) of the Act. This dispute was thereafter set for hearing before the ALJ.

On November 12, 1987, several months before the February 19, 1988, ALJ hearing, the National Joint Adjustment Board (the "NJAB") rendered a decision that supplied all contract terms that the parties had been deadlocked on. Therefore, at the time of the hearing the parties were working under two new unsigned contracts—a building-trades agreement and a paint-finishing contract. At this time there was still some dispute as to holidays. Nevertheless, no other negotiation sessions were held with regard to any other provisions of the con-

---

shop.…' " ALJ Decision and Recommended Order at 4–5, n. 4 (quoting *Associated Gen. Contractors of California,* 272 N.L.R.B. 891, 892, n. 5 (1979)).

**2.** Koch eventually provided the Union with answers to some of the eighty-eight questions. However, testimony at the ALJ hearing indicated that these limited responses were first received on February 19, 1988, the date of the ALJ hearing. Transcript of ALJ Proceedings at 50–52.

tract after the NJAB decision. Moreover, these new contracts did not change the scope of work or the unit that the Union represents.

## B. *Proceedings Below*

The Union presented the bulk of the aforementioned facts at the ALJ hearing. Koch, on the other hand, chose not to put on a case at the ALJ hearing.

On December 14, 1988, the ALJ issued its Decision and Recommended Order where it concluded that Koch's refusal to disclose information within its knowledge and control constituted unfair labor practices in violation of Section 8(a)(5) and (1) of the Act. In this decision, the ALJ found that the Union had an objective factual basis for believing that Koch was involved in double-breasted operations with Alpha Industries. Moreover, the ALJ determined that the requested information was relevant to both the negotiations and the *then-current* Article II subcontracting provisions. ALJ Decision and Recommended Order at 9–10.

The ALJ, in its Recommended Order, did not require Koch to answer all the questions presented in the questionnaire. Instead, the ALJ required that Koch respond to the questionnaire upon request and furnish the Union with only that information within its knowledge and/or control.

Koch excepted on several grounds to the ALJ decision in its Exceptions to the Administrative Law Judge's Findings of Fact, Conclusions of Law, and Recommended Order filed on January 3, 1989. In its Brief in Support of Exceptions Koch argued that all outstanding issues for the relevant paint-finishing agreement were deadlocked when they were sent to the NJAB for arbitration on July 23, 1987, and, therefore, disclosure was not necessary. Koch also asked the Board, in this Brief in Support of Exceptions, to take judicial notice of a Board Complaint issued on August 31, 1988. This Complaint alleged that the new bargaining agreement and the negotiations of this agreement were illegal. Koch argues that this potential illegality relieved it of the duty to disclose.

The Union also raised exceptions to the ALJ Decision and Recommended Order in its Limited Cross–Exception to the Administrative Law Judge's Decision. Specifically, the Union excepted to the ALJ's "unprecedented act of limiting the Respondent's [Koch's] burden to disclose information to only that information 'within its knowledge and/or control.' " Limited Cross–Exception to the Administrative Law Judge's Decision at 2. Moreover, the Union excepted to the ALJ's failure to impose an affirmative duty on Koch to obtain information in order to respond to the questionnaire. *Id.* At this time, the Union also made a motion to strike from the record evidence of the August 31, 1988, Board Complaint.

The Board issued a Decision and Order on June 15, 1989,[3] whereby the Board affirmed, with modifications, the ALJ's findings and conclusions. The Board affirmed the ALJ's finding that Koch's refusal to provide the relevant information constituted unfair labor practices in violation of Section 8(a)(5) and (1) of the Act. The Board specifically stated in its decision that "the Union had an objective factual basis for believing that the Respondent [Koch] was subcontracting unit work to Alpha and that Alpha and the Respondent were a double-breasted operation." Decision and Order at 1–2, n. 1. Moreover, the Board agreed with the ALJ's determination that the information was relevant to the Union's performance of its job as a collective-bargaining representative. *Id.* at 2, n. 1.[4]

In its decision the Board did not respond to Koch's request for judicial notice of the Board Complaint, nor did the Board answer the Union's Motion to Strike Evidence of such a Complaint. Instead, the Board held

---

**3.** The Board's Decision and Order is reported as 295 N.L.R.B. No. 73 (1989).

**4.** Although the Board agreed with the ALJ that Koch had violated Section 8(a)(5) and (1) in failing to provide information relevant to the Union's bargaining duties, the Board modified the ALJ's conclusions on this matter. This issue is discussed more fully in Section II of this opinion.

that the issue need not be addressed because the evidence of the subcontracting clause's illegality was not timely raised. Moreover, the Board further reasoned that, even if timely raised, the potential illegality of Article II was of no consequence to its decision. Decision and Order at 2, n. 1.

The Board did not adopt the ALJ's Recommended Order. Instead, the Board provided its standard remedy for failure to disclose situations. As a result, the Board's order, unlike the ALJ order, does not limit the required disclosure to information within Koch's knowledge and/or control.

Koch has made several arguments to this court in an attempt to prevent enforcement of the Board's order. First, Koch claims that there is not substantial evidence to support the Board's factual and legal findings. Koch also argues that they had no duty to furnish the requested information because the negotiations were deadlocked. Moreover, Koch argues that the Board erred in refusing to consider the effect of the potentially illegal negotiations and the Article II subcontracting provision. Finally, Koch argues that it was error for the Board to modify the ALJ's recommended order. For the reasons stated below, we find Koch's arguments unpersuasive, and we, therefore, grant the Board's request for enforcement.

## II.

## ANALYSIS

### A. *Standard of Review*

The Board petitioned this court for enforcement of its Decision and Order. We have jurisdiction to review the Board's Application for Enforcement pursuant to Section 10(e) of the Act. 29 U.S.C. § 160(e). The standard of review, also governed by Section 10(e), requires this court to uphold Board decisions if its factual findings are supported by substantial evidence on the record as a whole and if its legal conclusions have a reasonable basis in the law. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); 29 U.S.C. § 160(e).

The Board found that Koch violated Section 8(a)(1) and (5) of the Act when it failed to disclose information relevant to the Union's role as a bargaining representative. 29 U.S.C. § 158(a)(5), (1). The Board's finding of a Section 8(a)(5) and (1) violation is a predominantly factual determination and, therefore, we must uphold this determination if "it is supported by substantial evidence in the record as a whole." *Mary Thompson Hosp. v. NLRB*, 943 F.2d 741, 745 (7th Cir.1991); 29 U.S.C. § 160(e). " '[T]his standard of review does not allow us to dabble in fact-finding, and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case de novo.' " *NLRB v. Illinois–American Water Co., S. Div.*, 933 F.2d 1368, 1378 (7th Cir.1991) (quoting *NLRB v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506, 513 (7th Cir. 1991)).

### B. *Relevance*

■ An employer engages in an unfair labor practice when it "refuse[s] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The employer's duty to bargain requires that it "furnish all requested, relevant information 'that is necessary to the union in order for it to fulfill its obligation as representative of bargaining unit employees.' " *Mary Thompson*, 943 F.2d at 745 (quoting *Illinois–American*, 933 F.2d at 1377). This obligation requires an employer to furnish the union with the information necessary to police a current collective-bargaining agreement or to negotiate a new agreement. *General Elec. Co. v. NLRB*, 916 F.2d 1163, 1168 (7th Cir.1990).

■ The question of relevance focuses on the relevance of the information at the time of the request. That is, both a union's reasons for requesting the information and an employer's reasons for refusing disclosure are evaluated by looking at information known at the time of the demand and refusal. *General Elec.*, 916 F.2d at 1169.

### 1. Burden of Proving Relevance

■ A primary consideration when determining whether an employer has a duty to disclose information is whether the information is relevant to the union's collective-bargaining duties. *Id.* Certain types of information are "so intrinsic to the core of the employer-employee relationship" that they are presumptively relevant. *Atlas Metal Parts Co., Inc. v. NLRB,* 660 F.2d 304, 310 (7th Cir.1981) (citations omitted). "Conversely, when the requested information is not ordinarily pertinent to a union's role as bargaining representative, but is alleged to have become pertinent under particular circumstances, the union has the burden of proving relevance before the employer must comply." *Id.* (citing *San Diego Newspaper Guild v. NLRB,* 548 F.2d 863, 867 (9th Cir.1977)).

■ In the case before this court, the Union requested information in its questionnaire about the operations of Koch, the operations of Alpha Industries, and the relationship of these companies. The Union's letter to Koch, as well as its testimony at the ALJ hearing, indicate that this request for information focused on the issues of double-breasted operations and subcontracting. The Union also made several verbal requests for information about Koch's subcontracting to Alpha Industries. More specifically, requests were made about the possibility of Koch performing double-breasted operations through subcontracting.

In *Atlas Metal Parts,* this court refused to hold, without evidence presented to the contrary, that the issue of subcontracting is so intrinsic to the union's collective-bargaining duties as to make it presumptively relevant. *Atlas Metal Parts,* 660 F.2d at 310. *See also NLRB v. Leonard B. Hebert, Jr. & Co.,* 696 F.2d 1120, 1124 (5th Cir.1983), *cert. denied,* 464 U.S. 817, 104 S.Ct. 76, 78 L.Ed.2d 88 (1983) (union's requests regarding double-breasted operations are not presumptively relevant). The Union, in this case, like the union in *Atlas*

*Metal Parts,* failed to present evidence that its requests for information about subcontracting and double-breasted operations were so intrinsic to the Union's duty so as to make them presumptively relevant.

Moreover, the Union's requested information focused to a great extent on the operations of Alpha Industries, an employer with whom the Union did *not* have a bargaining relationship. As the Board conceded, other courts of appeals have held that a union's request for information about *employees* with whom a union does not have a bargaining relationship is not presumptively relevant. *NLRB v. U.S. Postal Services,* 888 F.2d 1568, 1570 (11th Cir.1989); *Walter N. Yoder & Sons v. NLRB, Inc.,* 754 F.2d 531, 535 (4th Cir. 1985). Accordingly, requests that pertain to the *operations of employers* with whom the union has no relations are not relevant either. *Bohemia, Inc. v. NLRB,* 272 N.L.R.B. 1128, 1129 (1984) ("when a union's request for information concerns data about employees or operations other than those represented by the union ... there is no presumption that the information is necessary and relevant to the union's representation of employees.").

For the above reasons, the Union had the burden of demonstrating to the Board that the requested information was relevant to its bargaining duties.

■ The courts apply a liberal discovery-type standard when determining the relevance of an information request. *Mary Thompson,* 943 F.2d at 745. Under this discovery-type standard, the union is entitled to " 'a broad range of potentially useful information ... for the purpose of effectuating the bargaining process....' " *Id.* (quoting *NLRB v. Pfizer, Inc.,* 763 F.2d 887, 889–90 (7th Cir.1985)).

In the case before this court the Board found that the requested information was relevant to the performance of its collective-bargaining duties in the ongoing negotiations with Koch.[5] Furthermore, the

---

**5.** The ALJ also found the requested information relevant to the Union's duty to police the then-current contract. As discussed later in this opinion, the Board did not adopt this finding and we, therefore, need not consider this issue on appeal.

Board found that the Union had "an objective factual basis for believing that the Respondent [Koch] was subcontracting unit work to Alpha and that Alpha and the Respondent were a double-breasted operation." Board's Decision and Order at 1–2, n. 1.

■ Although the relevance standard is a liberal standard, the courts will not allow the union to go on unfounded fishing expeditions. *See General Elec.*, 916 F.2d at 1167–68; *San Diego Newspaper Guild*, 548 F.2d at 868. Therefore, just as there are some limits as to what is discoverable information under the Rules of Civil Procedure, there are similar limits to discoverable information in the collective-bargaining context. These limits are not stringent, however; in fact, the Board may find a duty to disclose "if it finds even 'a probability that the information is relevant and that it will be of use to the union in carrying out its statutory duties.'" *Illinois–American*, 933 F.2d at 1378 (quoting *Pfizer*, 763 F.2d at 889). The ALJ articulated this burden as requiring the Union to demonstrate "a reasonable basis based on objective facts" for suspecting that the information sought will aid the union in its representational duties. ALJ Decision and Recommended Order at 8. Moreover, other Courts of Appeals, such as the Courts of Appeals for the Fourth, Fifth and Ninth Circuits, have also articulated this discovery-type standard as requiring a showing of reasonable suspicion. *See Walter N. Yoder & Sons*, 754 F.2d at 535 (if a union wishes to obtain information with regard to a possible contract violation due to the operation of an alter-ego company then the union need only establish "a reasonable basis to suspect such violations have occurred...."); *Leonard B. Hebert, Jr.*, 696 F.2d at 1125 (to obtain information with regard to possible double-breasting in violation of the collective bargaining agreement, "[i]t is sufficient that the information sought is relevant to possible violations where the union has established a reasonable basis to sus-

pect such violations have occurred...."); *NLRB v. Associated Gen. Contractors*, 633 F.2d 766, 771 (9th Cir.1980), *cert. den.*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981) (unions satisfied burden "by showing that the information sought is relevant to investigations of contract violations, and that there is a reasonable basis for further investigation...."). This articulation of the standard for determining relevance is fundamentally the same as that articulated by this court.

■ As applied to this case, this means that the Union needed to demonstrate the following to the Board: (1) it had a reasonable basis for suspecting that Koch was diverting bargaining unit work through subcontracting to Alpha Industries or by operating Alpha Industries as a second, nonunion company, and (2) there was a reasonable basis for believing that this information would be helpful to its collective-bargaining negotiations. *See Walter N. Yoder & Sons*, 754 F.2d at 535; *Leonard B. Hebert, Jr.*, 696 F.2d at 1125; *Associated Gen. Contractors*, 633 F.2d at 771. *See also* ALJ Decision and Order at 8 ("[t]he central question posed by the pleadings is whether the Union had a reasonable belief based on objective facts that the Respondent (Koch) and another company (Alpha), were engaged in double-breasted operations.").

2. Reasonable Basis for Suspicion

■ Implicit in the ALJ's finding of a Section 8(a)(5) and (1) violation is that the Union demonstrated a reasonable belief based on objective facts that Koch was involved in double-breasted operations. *See* ALJ Decision and Recommended Order at 8–10. Moreover, the Board upheld the ALJ's findings on this matter.[6] We find that there is substantial evidence, when viewing the record as a whole, to support this finding.

According to the unrefuted testimony, the Union first began to suspect that Koch

6. In its Decision and Order, the Board specifically stated that it "agree[d] with the judge [ALJ] that ... the Union had an objective factual basis for believing that the Respondent

[Koch] was subcontracting unit work to Alpha and that Alpha and the Respondent were a double-breasted operation." Board's Decision and Order at 1–2, n. 1.

was wrongfully diverting work to Alpha Industries and perhaps involved in double-breasted operations with Alpha Industries in 1983. The Union, thereafter, conducted investigations in an attempt to confirm these suspicions. Pursuant to these investigations, the Union received numerous reports, letters, and affidavits from Alpha Industries employees, the Union's representatives, and representatives from other unions. These reports furthered the Union's suspicion that Koch was wrongfully diverting work to Alpha Industries.

As mentioned above, when determining if the Union had sufficient facts to reasonably suspect a diversion of work, we must focus on those facts known to the Union at the time the request was made. *General Elec.*, 916 F.2d at 1169. The Union made its initial request for information when delivering the questionnaire to Koch on July 21, 1987. Much of the evidence of reasonable suspicion was presented in the form of dated affidavits and letters. Some of these letters and affidavits post-date this initial July request for information.[7]

Nevertheless, the record indicates that there was sufficient information received prior to this initial July request to support the finding of reasonable suspicion. For example, in 1983 the Union received a Dun & Bradstreet report indicating that one individual served as an officer and director of both Alpha Industries and Koch. Indeed, the Union also had documentation demonstrating that this officer/director used Koch's corporate address as his mailing address on an Alpha Industries certificate.

Furthermore, one particularly compelling report occurred in a 1983 phone conversation between Mr. Vinson, a former Alpha Industries employee, and Mr. Harmes, the Union's representative. A 1983 affidavit memorializing this conversation indicates that Koch wrote all Mr. Vinson's expense checks and paychecks while Mr. Vinson worked for Alpha Industries; *all* the installation and assembly jobs that Vinson performed involved Koch equipment; and Al-

pha Industries supervisors told Vinson that Alpha Industries was started by Koch as "their non-union company, because [Koch] could not afford to send their union men on small jobs." Exhibit GC–10.

Moreover, we know that in 1985 Mr. Platt and Mr. Peck, the Union's own agents, observed Alpha Industries non-union employees install equipment with Koch labels. Additionally, some of the Alpha Industries's employees told Mr. Peck, the Union President, that they were doing work subcontracted by Koch. Furthermore, these Alpha Industries's employees told Peck about other Alpha Industries's jobs where, while working for Alpha Industries, they installed Koch equipment. Similar stories were told to Mr. Platt on his separate visit.

It was reasonable for the Union to rely on the above observations of union officials, employee reports and records in forming its reasonable suspicion that the Union was diverting work to Alpha Industries. *See Walter N. Yoder & Sons*, 754 F.2d at 536 (both corporate records revealing common officers and union members' reports that the employer interchanged employees and work with a non-union company were sufficient for a finding of reasonable suspicion of double-breasted operations); *Leonard B. Herbert, Jr.*, 696 F.2d at 1123–26 (observations and statements of union members indicating an interchange of work formed a reasonable basis for suspecting double-breasted operations, thereby justifying demand for disclosure). Therefore, considering that Koch did not present any evidence contradicting the contents of these reports and observations, these pre-July 1987 reports alone constitute substantial evidence, when looking at the record as a whole, that the Union reasonably suspected that Koch was diverting work to Alpha Industries.

We, however, do not need to rely solely on the pre-July 1987 reports. This is because some of the post-July 1987 affidavits and letters, which refer to Koch's subcon-

---

7. We know that at least some of these affidavits and letters memorialize earlier conversations with Union representatives. It is unclear, how-

ever, when much of the information contained in these papers was verbally reported to Union officials.

tracting of work to Alpha Industries, are also relevant to the Union's claim of reasonable suspicion. This is true because the Union did not stop with its initial July questionnaire. Instead, the Union made several requests for information regarding subcontracting and possible double-breasted operations during its negotiation sessions with Koch, which lasted from July 1987 to November 1987. Therefore, the affidavits and reports that the Union received within this time frame constitute information known by the Union at the time of its demand for information. Consequently, some of these post-July documents further support the Board's finding that the Union alleged sufficient objective facts to warrant disclosure under the liberal discovery-type standard.

We do not agree with Koch's argument that the NLRB holding in *Bohemia* controls the disposition of this case. In *Bohemia* the union requested information because it suspected that the company was diverting work. *Bohemia*, 272 N.L.R.B. at 1129. However, the facts in *Bohemia* are very different from the facts in the current case. That is, in *Bohemia* the union offered *no* objective facts to support its suspicion that there was a diversion of work, 272 N.L.R.B. at 1129, whereas the Union in this case offered testimony and numerous reports to support its claim of reasonable suspicion.[8]

### 3. Relevance to Negotiations

■ Not only did the Board uphold the ALJ's finding that the Union had a reasonable basis for suspecting that Koch was subcontracting unit work and perhaps involved in double-breasted operations, but the Board also upheld the ALJ's finding that these suspicions, and thereby the request of information with regard to these suspicions, were relevant to the Union's duty to negotiate a new collective-bargain-

ing agreement. Board's Decision and Order at 2, n. 2. With the preexisting collective-bargaining agreement between the Union and Koch due to expire, the parties began negotiations for a new agreement on July 13, 1987. The record indicates that these negotiations continued until sometime in November of 1987.

The record indicates that the issue of subcontracting was discussed at some length during the approximately twelve negotiation sessions. Indeed, Koch's own company memorandum mentions two negotiation sessions where the parties discussed the issue of subcontracting work to non-union companies. The information requested in both the questionnaire and in the Union's verbal requests pertained to the issues of subcontracting and double-breasted operations. Therefore, the record as a whole supports the Board's finding that the requested information was relevant to the ongoing negotiations.

### 4. Relevance to the Then–Current Contract

The ALJ also found that the request for information was relevant to another one of the Union's collective-bargaining duties— the Union's duty to police the Article II, subcontracting provisions in the "then-current" collective-bargaining agreement. There is some ambiguity as to whether the ALJ's reference to the "then-current" agreement meant the unsigned "new agreement" that the parties were working under at the time of the ALJ hearing or the "old agreement" that the parties were working under at the time of the Union's request for information. As stated above, relevancy is determined by looking at the situation at the time of the information request. *General Elec.*, 916 F.2d at 1169. When the Union requested the disputed information, the "new agreement" was not in effect; therefore, the parties were still

---

**8.** There are two other important factors which make *Bohemia* distinguishable from the case before this court. First, the union in *Bohemia* failed to allege a specific contractual provision for which the diversion of work would be relevant. 272 N.L.R.B. at 1129. Second, the union in *Bohemia* failed to submit any evidence that

indicated that the diversion of work was ever raised in negotiations. *Id.* To the contrary, the Union in this case tied the relevance of the requested information to the Article II subcontracting provision, and the Union raised the issue of subcontracting several times during ongoing negotiations.

working under an "old agreement" that was due to expire.[9] Accordingly, the ALJ's finding of relevance to the "then-current" agreement must have meant the *only* relevant agreement—the "old agreement" in effect at the time of the Union's request—and not the irrelevant "new agreement" that the parties were working under at the time of the ALJ hearing. This is confirmed by the fact that the only agreement entered as an exhibit before the ALJ was this old agreement.

Although the ALJ found the information request relevant to the policing of the old agreement, it is not clear whether the Board adopted this finding. At one point in its Decision and Order, the Board stated that it relied specifically on the ALJ's finding that the requested "information related to subcontracting and that subcontracting was an issue in the ongoing negotiations." Board's Decision and Order at 2, n. 1. The ambiguity arises because it is unclear whether the Board, in stating that it was relying on the relevancy of the information to negotiations, implicitly rejected the ALJ's finding that the information was relevant to the then-current contract ("the then-current contract finding").

There is some argument that the context in which this statement was made indicates that the Board was not rejecting the "then-current contract finding." That is, the Board made the statement that it was relying on the relevance of the information to the ongoing negotiations in response to a contention by Koch that arguably put the "then-current contract finding" into question. As such, it is arguable that the Board was simply pointing out that this finding was not necessary for its conclusions and not specifically rejecting this finding. This argument is further supported by the fact that the Board never stated or even implied that this finding was flawed. As such, it is arguable that the Board's general adoption of the ALJ's findings encompasses the "then-current contract finding."

Nevertheless, the issue is not that simple. This is because the Board, without rejecting the "then-current contract finding," modified the ALJ's conclusions of law and recommended order in a manner which implies that the Board intended to narrow the scope of the ALJ's relevancy findings. This can be seen in the Board's modification of the ALJ's fifth conclusion of law. The ALJ's fifth conclusion of law broadly stated that Koch "failed to bargain collectively with the Union and has thereby engaged, and is engaging in unfair labor practices within the meaning of Section 8(a)(5) and (1) of the Act." ALJ Decision and Recommended Order at 11. The Board, however, modified the fifth conclusion to read as follows: "[b]y refusing to furnish the Union with the requested information *relevant to collective-bargaining negotiations,* the Respondent failed to bargain collectively and in good faith with the Union and has thereby engaged in unfair labor practices within the meaning of Section 8(a)(5) and (1)...." Board Decision and Order at 2 (emphasis added).

The ALJ's broad conclusion, when read in conjunction with its findings of fact, indicated that Koch violated the Act by failing to provide information relevant to *the policing of the old contract* and to the negotiation of a new contract. The Board's modified conclusion, which mentions nothing about the failure of Koch to provide information relevant to the policing of the old agreement, narrows this finding. That is, the Board *only* found that Koch violated the act in failing to provide information relevant to the negotiations conducted from July to November of 1987, and it did *not* conclude that Koch violated the Act in failing to provide information relevant to the policing of the old agreement. Moreover, the Board made similar modifications in its Order, where it specifically required the release of information "relevant to *collective-bargaining negotiations."* These modifications further indicate that the

---

9. The old agreement was due to expire in August of 1988. Exhibit GC–2. The new agreement came about by a ruling from the National Joint Adjustment Board on November 12, 1987. By the time of the ALJ hearing in February of 1988 the parties were working under this new agreement although it had not been signed.

Board did not adopt the ALJ's "then-current contract finding." Board's Decision and Order at 3 (emphasis added).

 Our role on appeal is to evaluate the validity of the Board's findings and conclusions. *See* 29 U.S.C. § 160(e). We, therefore, cannot make our own findings and conclusions. Because it appears that the Board did not adopt the ALJ's finding that the requested information was relevant to the Union's duty to police the then-current contract, we will not consider whether the record supports this finding.

### 5. Effect of a Possible Deadlock

Koch argues, however, that the requested information could not be relevant to the Union's bargaining duties because the negotiations became deadlocked when the Union sent the issues to arbitration before the NJAB on July 23, 1987.[10] Koch did not make or articulate this argument to the ALJ at either the ALJ hearing or at any time before the ALJ rendered its Decision and Recommended Order. Indeed, the record before the ALJ contained virtually no facts in support of this argument. The only evidence presented to the ALJ that even remotely touched on the issue of deadlock was that the Arbitrator issued a final decision rendering a final contract on November 12, 1987, and that "this contract supplied all contract terms that prior to that time the parties had been deadlocked on." Transcript of ALJ Hearing at 53. Koch, a party represented by competent counsel, did not present any evidence as to when the negotiations were sent to arbitration, why they were sent to arbitration, or which party sent them to arbitration. Moreover, there was no evidence presented as to which specific contract provisions the parties had been deadlocked on. Considering that the ALJ had before it unrefuted evidence that there were approximately twelve negotiation sessions between July and November of 1987 and that subcontracting was a disputed issue in these nego-

tiations, it was perfectly reasonable for the ALJ to assume that the issues were sent to arbitration after the negotiations ceased. Indeed, there was no factual basis for concluding otherwise.

 The Board argues that Koch, in order to preserve this issue, was required to present evidence of deadlock to the ALJ and that the failure to do so deprives the Board and this court of the authority to review the issue. The Board's Brief On Application for Enforcement of an Order of the National Labor Relations Board does not cite to any direct authority for this argument. Nevertheless, we have found sufficient authority backed by sound reasoning to support the Board's argument.

First, the Board's Summary of Standard Procedures in Formal Hearings Held Before the National Labor Relations Board in Unfair Labor Practice Proceedings Pursuant to Section 10 of the National Labor Relations Act, As Amended, Form NLRB–4668 (3–83), contains some authority for this proposition. Exhibit, GC–1(j). Namely, this Summary states that "copies of exhibits should be supplied to the Administrative Law Judge and other parties at the time the exhibits are offered in evidence." If copies are not served to the Administrative Law Judge "before the close of hearing" and if there is no good reason demonstrated for failure to file such copies, then the exhibits may be rejected. Considering that the mere failure to timely file copies of exhibits constitutes waiver under the Board's procedures, then surely the complete failure to present any evidence or exhibits precludes later review without a showing of good reason.

Moreover, decisions by the NLRB and the Court of Appeals for the Sixth Circuit also support the argument that Koch waived the issue of deadlock by failing to present evidence of deadlock before the ALJ. In *Camay Drilling Co. v. NLRB,* 254 N.L.R.B. 239 (1981) the Board refused

---

**10.** Although deadlock may have arguably alleviated the need for the Union to obtain information in order to negotiate deadlocked issues, it is less clear how deadlock destroyed the Union's need to obtain information to police the preex-

isting agreement. Nevertheless, because the Board apparently did not adopt the ALJ's finding that the information request was relevant to the policing of the old agreement, we need not address this question.

to review an issue that was not fully litigated at the hearing stage. 254 N.L.R.B. at 240, n. 9. Likewise, the Court of Appeals for the Sixth Circuit, in *Local 594, Int'l Union, United Automobile Workers of America v. NLRB*, 776 F.2d 1310 (6th Cir.1985), held that the party's failure to raise an issue before the ALJ meant that the issue could not be raised for the first time before the Board. 776 F.2d at 1314. These decisions are backed by sound reasoning.

■■■ The ALJ, not the Board, is the fact-finder in administrative proceedings. *See Sahara Coal Co. v. Office of Workers' Comp. Programs, U.S. Dept. of Labor*, 946 F.2d 554, 557 (7th Cir.1991). That is, the ALJ is to some extent the administrative equivalent of the federal district judge in the civil and criminal system. Indeed, the administrative regulations require the ALJ to follow the rules of evidence to the extent possible in conducting its proceedings. 29 C.F.R. § 102.39. Therefore, just as parties are not permitted, without restriction, to present new evidence on appeal in the civil and criminal context, neither should Koch be permitted to raise evidence and issues to the Board that were available but not raised to the ALJ. Indeed, if parties were permitted to present new evidence to the Board without restriction, then this would disrupt the ALJ's role as fact-finder. Furthermore, in the context of this case, if we considered the deadlock argument at such a late stage, it would overly burden the Union who did not have an opportunity to defend this claim. *See Camay*, 254 N.L.R.B. at 240, n. 9 ("to determine an issue of this magnitude when it is raised for the first time as a post-hearing theory would place an undue burden on Respondent and deprive it of an opportunity to present an adequate defense."). Therefore, Koch waived the ability to raise this argument before this court.

Moreover, even if Koch had not waived this issue, we would be without jurisdiction to consider the effect of a possible deadlock. This is because the only evidence of

deadlock contained in the record are facts *alleged* in a NLRB Complaint (the "Complaint") issued in an unrelated dispute between Koch and the Union. Facts alleged in a complaint are just that—alleged facts. They do not prove anything. Indeed, the alleged facts, in the context of this case, are especially incapable of proving anything because the evidence before the ALJ was contrary to these alleged facts. That is, the record before the ALJ indicated anything but deadlock on the issue of subcontracting; instead, the record indicated that subcontracting was a heavily negotiated topic. Our role in this enforcement action is to review the ALJ's and the Board's conclusions. *See*, 29 U.S.C. § 160(e). We cannot resolve this factual conflict and, thereby, make a factual determination. Moreover, Koch has not asked us for leave to adduce additional evidence on this issue, nor would Koch be justified in making such a request. This is because under Section 10(e) of the Act we are only authorized to remand a case for further evidence if there "were reasonable grounds for failing to adduce such evidence in the hearing before the Board, its member, agent, or agency...." 29 U.S.C. § 160(e). Koch has provided no reasons whatsoever for not presenting suitable facts on the issue of deadlock.

Both Koch's failure to demonstrate a good reason for not presenting evidence of deadlock to the ALJ and our inability to make factual findings preclude us from reviewing the effect of a possible deadlock on appeal.[11]

## C. *Allegations Regarding the Illegality of the Negotiations and the Resulting Contract*

■■■ Koch also argues that the Union's allegedly unfair bargaining activities, with respect to the negotiations of the new agreement and the potential illegality of the resulting agreement, alleviate its duty to disclose the requested information. Koch relies on the unrelated NLRB Complaint issued on August 31, 1988, for this

---

11. Because we have already concluded that Koch waived the deadlock issue, we do not need

to address whether the failure to file a motion for reconsideration constitutes waiver.

proposition. This Complaint, initiated by Koch, alleges that the Union conducted unfair labor practices by bargaining to impasse on the issues of subcontracting, and it alleges that the provisions of this new agreement, unrelated to subcontracting, unlawfully expand the relevant bargaining unit. Koch argues that the potential illegality of the new contract and the negotiations relieve Koch of a duty to disclose information relevant to these activities. As such, Koch argues that the Board erred when refusing to consider evidence of this potential illegality.[12]

As discussed above, parties should present all available evidence to the ALJ and not wait to present evidence to the Board. Koch did not present facts with regard to the potential illegality of the agreement or the potential illegality of the Union's bargaining tactics at the ALJ hearing.

The Board issued the Complaint on August 31, 1988, approximately six months after the February 1988 ALJ hearing. In December of 1988, about three and one-half months later, the ALJ issued its final decision. Koch first brought the Complaint's possible relevancy to the Board's attention in January of 1989. The Board concluded that Koch had failed to raise this issue in a timely manner. Board's Order and Decision at 2, n. 1.

Koch argues that it is excused from not raising this issue at an earlier time because two events had to occur before Koch could have anticipated the relevancy of the Union's potentially illegal actions. First, Koch argues that it could not possibly have anticipated before the issuance of the ALJ's Decision and Recommended Order that the ALJ would find the requested information relevant to the subcontracting clause mentioned in the Complaint. We find this argument unpersuasive considering that the Union informed Koch in a hand-delivered letter that this information was relevant to Article II subcontracting on July 26, 1987. Furthermore, Koch's own company memorandum indicates that subcontracting was an issue of dispute in the negotiations for a new collective-bargaining agreement and that the Union pushed for information regarding this issue. It takes no great leap in logic for Koch to realize that, when the Union made a request during ongoing negotiations for information about Koch's subcontracting activities, this requested information was relevant to the negotiation of a subcontracting provision. We, therefore, reject Koch's argument that it could not have anticipated the ALJ's finding on this issue.

Secondly, Koch argues that it could not have anticipated that the contract was illegal or that the Union bargained illegally because the Complaint that Koch initiated was not issued until six months after the ALJ hearing. The problem with this argument is that the information contained in the Complaint was available to Koch at the time of the ALJ hearing. That is, at the time of the hearing Koch knew whether or not the Union had bargained issues to impasse, and Koch had the potentially illegal contract before it. Accordingly, this is not a situation where new evidence has changed Koch's position. Instead, this is a situation where a later event—the issuance of the Complaint—suddenly made Koch aware of the relevance of facts available to it at the time of the hearing. Koch's inability to see the legal relevance of these facts is not a sufficient justification for failing to raise this issue to the ALJ.

For the above reasons, the Board properly determined that Koch failed to raise this issue in a timely manner and the Board was, therefore, correct in refusing to consider this issue. Accordingly, we are without authority to review this issue on appeal.[13]

---

**12.** It is not entirely clear on the record before us how the alleged illegality of the new contract or the potential illegal negotiations destroy Koch's duty to disclose information relevant to possible violations of the old agreement. Nevertheless, we need not address this issue because the Board apparently did not adopt the ALJ's finding that the information was relevant to the policing of the old agreement.

**13.** Having decided that Koch waived the issue by not raising it to the ALJ, we need not decide whether Koch's failure to file a motion for re-

■ According to the record, the Union did not receive answers to any of its questions during the ongoing negotiations. Indeed, the record indicates that the only answers that the Union received from Koch were partial answers, received for the first time on February 19, 1988. This was nearly seven months after the initial request and three months after negotiations had ceased. Because the record supports both the finding that the Union had reason to suspect that Koch was diverting work to Alpha Industries, and because the record indicates that further information regarding such a diversion of nonunion work was relevant to the bargaining of a new collective-bargaining agreement, we find that there is substantial evidence based on the record as a whole to uphold the Board's decision that Koch violated Section 8(a)(5) and (1) when it failed to provide the Union with any of the requested information at or near the time of the request.

### D. *The Board's Modification of the ALJ's Recommended Order*

The ALJ's Recommended Order only required Koch to disclose that information within its knowledge and/or control. The Board did not adopt this limitation in its Order. Koch argues that the Board erred when modifying the ALJ's Recommended Order and that we should reinstate the ALJ's Order.

The Board explained in its brief that it did not necessarily intend to require Koch to disclose information beyond its knowledge and/or control. Instead, the Board explained that when modifying the Order it intended to require Koch to do what it should have done in 1987—focus on each of the questions and supply a response. If Koch cannot answer any of the questions because the information requested is beyond its knowledge and/or control, then the Board apparently asserts that Koch should raise this fact when responding to each of the eighty-eight questions. Moreover, the Board urges that any disputes regarding Koch's refusal to answer specific questions for lack of knowledge and/or

consideration after raising the issue to the

control will be resolved at the compliance proceedings. Board's Decision and Recommended Order at 2, n. 2.

The "particular means by which the effects of unfair labor practices are to be expunged are matters 'for the Board not the court to determine.'" *Virginia Electric Power Co. v. NLRB*, 319 U.S. 533, 539, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1940) (quoting *International Assoc. of Machinists v. NLRB*, 311 U.S. 72, 82, 61 S.Ct. 83, 89–90, 85 L.Ed. 50 (1940)). As such, the Board has wide discretion in formulating its remedies. Indeed, the administrative remedy "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.* 319 U.S. at 540, 63 S.Ct. at 1218-19.

■ In an attempt to facilitate informed, good-faith collective-bargaining, Section 8(a)(5) and (1) of the Act require parties to disclose information which will be helpful to the Union in carrying out its collective-bargaining duties. *See Pfizer*, 763 F.2d at 889–90. The Board, by requiring Koch to supply the requested information, is putting the burden on Koch, the noncomplying party, to demonstrate why it is unable to reveal specific information. Placing the burden on Koch, the noncomplying party, fairly achieves the Act's policy of facilitating informed, good-faith bargaining. Therefore, it seems to be within the Board's authority to implement a remedy that leaves to the compliance stage the issue of whether information is within Koch's knowledge and/or control.

Indeed, the Court of Appeals for the Sixth Circuit came to a similar conclusion in *NLRB v. Rockwell Standard Corp., Transmission and Axle Div., Forge Div.*, 410 F.2d 953 (6th Cir.1969). In that case, the respondent asserted that an order for disclosure, under Section 8(a)(5) and (1) of the Act, should have been denied because there was no showing that the requested information existed or that the respondent had the requested information within its

Board constituted waiver.

control. *Rockwell,* 410 F.2d at 958. The *Rockwell* court found that argument unpersuasive, especially considering that the respondent had made no good-faith attempt to comply with the request. *Id.*

Moreover, the Courts of Appeals for the District of Columbia and the Tenth Circuit have also considered issues similar to that raised by Koch. These courts found that the possibility of a substantial time and money burden did not excuse the duty to disclose. Instead, these Courts of Appeals agreed that these issues should be reserved for the compliance stage. *Safeway Stores, Inc. v. NLRB,* 691 F.2d 953, 957 (10th Cir. 1982) ("time and pecuniary considerations, though not irrelevant, are not a basis for refusing to supply requested information. Negotiations concerning a means of reducing the employer's burden are proper at the compliance stage but not at the request stage...."); *International Union of Electrical, Radio and Machine Workers v. NLRB,* 648 F.2d 18, 26 (D.C.Cir.1980) (time and money considerations "are not irrelevant and must be considered at compliance stage, but as bases for initially refusing to supply the requested data they are in this case unpersuasive....").

Koch made no good-faith attempt to supply the requested information to the Union at or near the time of the request. In fact, Koch did not supply answers to any of the Union's questions until the ALJ hearing—nearly seven months after the Union's initial request for information and about three months after negotiations had ceased. Accordingly, it was reasonable for the Board to render an Order that forces Koch to bring forth evidence at the compliance stage explaining its inability to supply any of the requested information. Therefore, while ultimately it may well be error for the Board to require Koch to disclose information beyond its knowledge and/or control, it was not error for the Board to render an Order which saves this issue for the compliance stage.

## III.

## CONCLUSION

For the above reasons, we uphold the Board's finding that Koch conducted unfair bargaining practices when it failed to provide the Union with information relevant to collective-bargaining negotiations. Furthermore, we find that the Board was within its discretion when formulating its Order. We, therefore, grant the Board's Application for Enforcement.